UNITED STATES of America,
Plaintiff-Appellee,

v.

James Nicholas GORDY,
Defendant-Appellant.

No. 75–1522.

United States Court of Appeals,
Fifth Circuit.

Jan. 29, 1976.

632

Raymond C. Caballero, El Paso, Tex., for defendant-appellant.

John E. Clark, U. S. Atty., San Antonio, Tex., William B. Hardie, Jr., Ronald F. Ederer, Asst. U. S. Attys., El Paso, Tex., for plaintiff-appellee.

Before COLEMAN, CLARK and INGRAHAM, Circuit Judges.

CLARK, Circuit Judge:

The issue of double jeopardy raised by this appeal turns on the propriety of a pre-verdict discharge of the jury which first tried defendant. At his second trial, defendant was convicted by a jury of possession with intent to distribute approximately 2,296 pounds of marijuana. 21 U.S.C. § 841(a)(1). Far from depicting indifference to the defendant's right to the first jury's verdict, the record shows a "harried" trial judge attempting to carry the weight of a crowded docket which had been aggravated by the demands of a speedy trial plan and the sudden death of his fellow judge. However, because the determination of manifest necessity for a mistrial depends upon the state of the jury rather than the state of the judge or the court's docket, we reverse the conviction.

Defendant Gordy was initially tried on a two-count indictment charging conspiracy to possess and possession with intent to distribute marijuana. 21 U.S.C. §§ 841(a)(1), 846. On December 6, 1974, he was acquitted of the conspiracy to possess charge and, over defendant's objection, the trial court declared a mistrial on the possession count, ostensibly because the jury was unable to agree on a verdict. Gordy was retried and convicted of possession on February 11–12, 1975. He appeals from that conviction, claiming, inter alia, that his retrial was barred by the Fifth Amendment.

At both trials, the government sought to prove its case of constructive possession against Gordy by means of circumstantial evidence. The facts essential to a resolution of this appeal are undisputed. On July 24, 1974, Mrs. Graham, the owner-operator of Alpha Storage Lockers in El Paso, noticed that a lock had been placed on unrented locker # 180. Mrs. Graham picked the lock, removed 44 boxes stored inside, placed her own lock on the door and notified the police. The police determined that each box contained approximately 50 pounds of marijuana. Hoping to discover the owner of the contraband, the police replaced the boxes in locker # 180, returned the original lock to its position and kept watch. Nothing developed. On the morning of July 29, they removed the marijuana and placed a new lock on the door. That afternoon, the defendant, who had rented two lockers from Alpha since October 1973, initiated a conversation with Mrs. Graham and, during its course, asked her if she was good at remembering names and faces. The next evening Gordy went to Mrs. Graham's home and told her that friends of his had been wrongfully using locker # 180 to store seeds. He offered to pay back rental to cover this deception from July 25 to date. Mrs. Graham accepted this lease payment from Gordy then alerted the police who resumed surveillance of the now empty locker. Defendant was arrested on July 30 when the police observed him coming out of locker # 180. It was later determined that he had gained entry by cutting the police department's lock with a set of bolt cutters.

Upon being advised of his constitutional rights, Gordy explained to the police that he had received anonymous calls offering him as much as 2500 dollars to go to locker # 180 and make sure it was "cool." He denied knowledge of the locker's contents and suggested that the police go to his home and wait for the anonymous caller to make contact. The police declined to cooperate.

More directly bearing on Gordy's double jeopardy contention are the circumstances surrounding the jury's deliberations and discharge at his first trial. In an attempt to compensate for the recent death of Judge Guinn and the crowded El Paso docket, Judge Wood conducted a succession of extra length court sessions during the week of defendant's trial. The pace was hectic and on more than one occasion the judge expressed concern that he might miss his scheduled flight to San Antonio on December 6 and thus be unable to prepare for an upcoming court term. Within the first three days of this El Paso session, three criminal cases were tried. Testimony in two of them was heard well into the evening hours.

The trilogy of cases which we decide today began on the morning of December 4, 1974. Except for their nexus on the trial docket, the causes are unrelated. At 10:00 a.m., the case of *United States v. Sandoval* commenced. With breaks for dinner, lunch and coffee, the jury heard testimony until 10:00 p.m. that night. At 8:30 a.m. on December 5, the Sandoval jury returned to take additional testimony, hear arguments and receive instructions. Deliberations began around noon and a guilty verdict was returned approximately five and one-half hours later. At about 1:00 p.m. the same day, the first Gordy trial began before another jury. By 7:00 p.m. the trial had ended and that jury was ordered to return at 8:30 a.m. the next morning to begin deliberations. Shortly after the completion of the Gordy case, the court began to take testimony in the case of *United States v. Diharce-Estrada*, 526 F.2d 637 (5th Cir. 1976). The Diharce trial did not recess until 10:25 p.m. The same attorney represented both Mr. Gordy and Mr. Diharce-Estrada.

On the morning of December 6, 1974, the Gordy jury began its deliberations. In addition, the Diharce jury received instructions and began its deliberations. Before noon, the Diharce jury had announced its verdict of guilty. The verdict of the Gordy jury became the last objective of this El Paso session.

The total deliberations in Gordy lasted approximately five and one-half hours. Just before the break for lunch at 1:00 p.m., the jury submitted this question in writing to the court: "Would you give us the definition of possession (second count)"? Before responding, Judge Wood notified defense counsel that he intended to answer by giving the jury an instruction sheet which contained the standard definition of actual and constructive possession previously given in the oral charge to the jury. Defense counsel then expressed concern that the jury might be confused as to whether the defendant could have been in possession at a time when the marijuana was no longer in the locker, and requested that the court instruct the jury that they must find that Gordy had possession of locker # 180 at some time when it actually contained the contraband. The court denied the request and gave only the standard instruction.

The panel then recessed an hour for lunch and resumed deliberations at approximately 2:00 p.m. The record reflects that shortly before 3:00 p.m. the jury was brought in and the following exchange took place.

THE COURT: Members of the Jury, you may be seated. Mr. Foreman, if I interpret what you say right, you all have a hung Jury, is that right? You cannot agree?

THE FOREMAN: On the second count, Sir.

THE COURT: Have you reached a verdict on one count?

THE FOREMAN: Yes sir.

THE COURT: You did reach a verdict on one count?

THE FOREMAN: On one.

THE COURT: All right. All right, hand the verdict to Mr.—is that a unanimous verdict on that one count? All twelve of you did agree on it?

THE FOREMAN: Yes, sir.

THE COURT: Okay. All right. Gentlemen, just approach the bench.

(At the bench)

THE COURT: Now, here's the verdict. Now, I think we ought to call the Foreman over and ask him how they stand on that count.

MR. CABALLERO: Maybe we should, Your Honor.

THE COURT: Mr. Yanez, would you approach the bench, please sir.

(The Foreman then approached the bench.)

THE COURT: Mr. Yanez, this is in confidence, but I want the lawyers to know it and the parties, how do you stand on the vote on that count?

THE FOREMAN: Six-six.

THE COURT: A flat split. Okay. All right. All right, you may take your seat.

All right, I will accept the verdict on count one. The verdict on count one is "Not guilty." The Jury of course hung as counsel for both sides know on count two.

All right. Now members of the Jury, I want to thank you very much for the time you spent in this case and the indulgence you have afforded me and the time you have taken to make it possible for me to complete a monumental docket this week. We will have a visiting Judge here. We will have Chief Judge Smith, Orma Smith, Chief Judge of the Northern District of Mississippi here on January the 6th. So when you come back here I hope we are not going to be as harried. We will have two Judges and we won't have to work the long hours. But we have had a vacancy here since June the 9th when our beloved Judge Guinn passed away. So we have had to work long hours. I hate to keep you like this. In fact, I hate to stay here until 10:00 or 11:00 at night. But it is essential when these things happen and we have to do it.

MR. CABALLERO: Your Honor, may I interrupt the Court and approach the bench with counsel.

(At the bench)

MR. CABALLERO: For the purpose of the record, Your Honor, as I stated before to the Court when I believe the second question came back on possession—

THE COURT: Oh, let's don't go into that right now. I'm going to discharge this jury. I can make my plane if you will just get off my back long enough for me to do it. I can make my plane if you'll let me. Can't you make a motion?

MR. CABALLERO: Well, Your Honor—

(In the hearing of the Jury:)

THE COURT: Members of the Jury, you are excused. Thank you very much. Bear in mind your deliberations are secret. Do not discuss the case with anybody. You are excused.

(At the bench)

THE COURT: All right, now, what is it?

MR. CABALLERO: Your Honor, I simply wanted to make it a matter of record that this Jury deliberated approximately five or five-and a-half hours.

THE COURT: All right. All I want Mrs. Clark to do is make a record when the Jury returned. Well I know exactly when they said they couldn't agree. They couldn't agree at seven minutes until three. My Court Reporter has everything on the time.

MR. CABALLERO: I do object to a mistrial being called at this point and the Jury being released on the second count, particularly in view of my request that the Court instruct the Jury on this count of possession that I knew was bothering them, that is, whether someone could in fact possess marijuana when it wasn't there.

THE COURT: Okay. I overrule the objection.

Gordy's preliminary plea alleging that the dismissal of the December jury was premature and resulted in a bar to further prosecution was denied prior to his second trial. To support his contention that the dismissal was improper, defense counsel asked the court's permission to interview members of the first jury panel to determine if there had been any unauthorized communications during deliberations. The basis for this request was contained in an affidavit submitted by defense counsel's wife. In the affidavit, Mrs. Caballero related that at a party she spoke to an unidentified female who served as a juror in the first Gordy trial. The juror told the affiant that she felt rushed in her deliberations on the second count and that she knew Judge Wood had to leave El Paso. Prior to sentencing, on March 17, 1975, the court received testimony from the United States Marshall concerning the events prior to discharge. Marshall Roberson stated that he never informed the jury of the judge's travel plans. He went further to state that he had privately related to the foreman that the judge had requested the jury to deliberate until they were hopelessly deadlocked. The court agreed with the Marshall's recollections and denied defendant's motion to interview the jury panel.

■ The Fifth Amendment prohibition against double jeopardy has never been thought to mean that the court cannot conduct a second trial when the first jury is unable to reach a unanimous verdict. In the seminal case of *United States v. Perez*, 22 U.S. (9 Wheat.) 579, 6 L.Ed. 165 (1824), the United States Supreme Court held that the genuine inability of a jury to agree on a verdict provides manifest necessity for discharge. Even though the defendant may object, such a mistrial does not raise a bar to reprosecution. The flexible *Per-*

*ez* standard has been repeatedly applied to test the exercise of the trial court's discretion.

We think, that in all cases of this nature, the law has invested courts of justice with the authority to discharge a jury from giving any verdict, whenever, in their opinion, taking all the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated. They are to exercise a sound discretion on the subject; and it is impossible to define all the circumstances which would render it proper to interfere. To be sure, the power ought to be used with the greatest caution, under urgent circumstances, and for very plain and obvious causes . . . .. *Id.* at 580.

■ The "manifest necessity" doctrine of *Perez* is designed to accommodate the defendant's right to have his trial completed by the first competent tribunal with the public's interest in "fair trials designed to end in just judgments." *Wade v. Hunter*, 336 U.S. 684, 689, 69 S.Ct. 834, 837, 93 L.Ed. 974 (1949). The approach is incompatible with a mechanical application of rules and exceptions. Even in the classic case of an apparently deadlocked jury, a reviewing court must examine the circumstances surrounding the discharge to determine if the trial court exercised its limited discretion to abort the proceedings in a manner consistent with the protection of the defendant's Fifth Amendment rights.

■ As an aid in applying the *Perez* test to concrete cases, the courts of appeal have isolated several pertinent factors, though emphasizing that no one is necessarily controlling. If a timely objection has been made by the defendant,[1] the reviewing court should consider the length of the trial, the complexity of the

1. When the defendant moves for a mistrial or does not object timely to the declaration of a mistrial, his double jeopardy claim may be vitiated by his consent. *See United States v. Beckerman*, 516 F.2d 905 (2d Cir. 1975); *United States v. Goldstein*, 479 F.2d 1061 (2d Cir.

1973), *cert. denied*, 414 U.S. 873, 94 S.Ct. 151, 38 L.Ed.2d 113 (1973); *Grogan v. United States*, 394 F.2d 287 (5th Cir. 1967), *cert. denied*, 393 U.S. 830, 89 S.Ct. 97, 21 L.Ed.2d 100 (1968).

issues involved and the length of deliberations. In addition, the trial judge's communications with the jurors are particularly significant. The Ninth Circuit has held that a statement from the jury that it is hopelessly deadlocked is a crucial factor, although a present inability to agree is not determinative of the question of whether future deliberations might prove helpful. *United States v. See*, 505 F.2d 845, 851 (9th Cir. 1974), *cert. denied sub nom., Gordon v. United States*, 420 U.S. 992, 95 S.Ct. 1428, 43 L.Ed.2d 673 (1975).

■ When weighing the variables, an appellate court must not lose sight of the fact that the trial judge is in the best position to determine whether there exists a reasonable possibility that an impartial verdict can be reached. Despite the deference to be accorded the trial court's judgment, reversal is required when the discharge was not manifestly necessary. For example, an abuse of discretion was found when a trial court declared a mistrial on the basis that deliberations had lasted long enough, in the face of a claim by the foreman that the jury was on the verge of reaching a verdict. *United States v. Lansdown*, 460 F.2d 164 (4th Cir. 1972). Similarly, the double jeopardy bar was raised when a trial judge, assuming that the jury was physically exhausted, ordered a discharge despite the forelady's statement that the panel had "not yet" reached a verdict. *United States ex rel. Russo v. Superior Court*, 483 F.2d 7 (3d Cir.), *cert. denied*, 414 U.S. 1023, 94 S.Ct. 447, 38 L.Ed.2d 315 (1973). The Third Circuit also ruled that reprosecution was prohibited following a trial which was terminated by the trial court's *sua sponte* dismissal of the jury after six and one-half hours of deliberations. *United States ex rel. Webb v. Court of Common Pleas*, 516 F.2d 1034 (3d Cir. 1975).

■ The circumstances surrounding this impacted court session strongly indicate that the hurried atmosphere which pervaded Gordy's trial contributed to a premature dismissal of the December 1974 jury. Although the evidentiary portion of the trial was short, it cannot be said that the five and one-half hour length of jury deliberations demonstrated an inability to agree. The panel understood the facts of the case well enough to reach a unanimous verdict that the proof did not show Gordy was guilty of conspiracy to possess marijuana. It is altogether reasonable to speculate that its failure to reach a decision on the second count stemmed from difficulty in appreciating and applying the legal definition of constructive possession to the unique series of events shown by the proof in this case, rather than from having developed any irreconcilable difference in characterizing the facts.

The court's communications with the jurors prior to discharge were too inconclusive to demonstrate the existence of a "manifest necessity" to terminate the trial. Accepting the post-trial proceedings as sufficient, the Marshall's secondary testimony indicated that it was the jury rather than the court who initiated the report which led to the discharge. Such acceptance, however, still leaves the doubts created by the lack of a record clearly demonstrating that the panel members felt no verdict could be reached if they were given more time. The foreman publicly stated the jurors were "hung" and privately told the court that the group stood 6 to 6. No dialogue was developed with panel members individually. Assuming that the foreman correctly interpreted the feelings of the other jurors, that report alone cannot answer the more important question of whether their present inability to agree should have been characterized as permanent.[2] Everyone recognized that the

---

2. This court has held that the mere asking of the question concerning numerical division of the jury is error *per se*. *United States v. Amaya*, 509 F.2d 8 (5th Cir. 1975). The rule is designed to prevent coerced verdicts. It may have no application where the question is asked to the foreman alone, with defendant's consent, and the court discharges the jury immediately after asking the prohibited question.

trial had been rushed. Although there is no evidence in the record that Judge Wood told the Gordy jury of his travel plans,[3] Mrs. Caballero's affidavit shows it to be likely that the jury had become aware from the general atmosphere in the courthouse or other sources that the judge planned to leave El Paso imminently. The knowledge that the closing of this session depended on them or that they could be responsible for upsetting the judge's departure could have promoted the deadlock or prompted the jury to give up its deliberations without finalizing its debate on the possession count. The Supreme Court requires that in close double jeopardy cases these reasonable doubts be resolved in favor of the liberty of the citizen. *Downum v. United States,* 372 U.S. 734, 738, 83 S.Ct. 1033, 1035–36, 10 L.Ed.2d 100 (1963).

On the record before us, we cannot say with the necessary certainty that further deliberations, at least until the end of the day, would have proved futile. Under the applicable standard, the record demonstrates no manifest necessity for declaring a mistrial. Thus, Gordy's second trial violated the proscription against double jeopardy. Our decision today only applies the *Perez* case-by-case standard to the totality of the factors present here. We create no new or stricter rules regarding a trial judge's communications with jurors, nor do we purport to provide a mechanistic formula for determining the proper time to discharge a jury.

Since we conclude that Gordy's retrial violated the Fifth Amendment, we need not reach his other assignments of error.

Reversed.

---

**3.** It is a matter of record that Judge Wood told the Diharce jury of his scheduled departure.