**UNITED STATES of America**

v.

**Ana Lenor**
**FEIJOO–TOMALA, Defendant.**

**No. 89–CR–795(S).**

United States District Court,
E.D. New York.

Sept. 26, 1990.

Andrew J. Maloney, U.S. Atty. (Miriam Best, Asst. U.S. Atty., of counsel), E.D. N.Y., Brooklyn, N.Y., for U.S.

The Legal Aid Soc. (Douglas Morris, of counsel), Brooklyn, N.Y., for defendant.

### MEMORANDUM and ORDER

BARTELS, District Judge.

On June 8, 1990, the Court declared a mistrial following the jury's inability to reach a verdict on the indictment charging the Defendant Ana Feijoo–Tomala ("Feijoo–Tomala") with importing cocaine into the United States. Feijoo–Tomala followed

with a motion for an order dismissing the indictment against her on the ground that the Double Jeopardy clause of the Fifth Amendment bars any further prosecution. For the reasons stated below, the motion is denied.

## FACTUAL BACKGROUND

On October 26, 1989, Feijoo–Tomala, accompanied by her two young daughters, returned to the United States, via John F. Kennedy International Airport, after a several month sojourn in Ecuador. Among her possessions were three soft-sided suitcases and a hard-sided brown suitcase. During a routine baggage check Customs Agents discovered cocaine in cellophane pouches, taped to cardboard inserts and secreted in a specially created false bottom of the hard-sided suitcase. Feijoo–Tomala was arrested and subsequently charged in a one count superseding indictment with knowingly and intentionally importing in excess of 500 grams of a substance containing cocaine into the United States from a place outside thereof, in violation of 21 U.S.C. §§ 952(a), 960(a)(1) and 960(b)(2)(B)(ii).

The only issue in the case was whether or not Feijoo–Tomala knew there was cocaine in the suitcase. The Government presented its case in one day through four witnesses—two Drug Enforcement Agency ("DEA") agents and two United States Customs officials. The Defendant presented her case over a period of one and one half days. In addition to testifying on her own behalf, Feijoo–Tomala called her husband and eldest daughter as witnesses. A total of twenty-four (24) exhibits were offered into evidence.

The jury began deliberations at approximately 12:30 p.m. on Friday, June 8, 1990, the third day of the trial. Shortly after retiring to begin deliberations the jury sent their first note in which they requested to examine the cardboard inserts discovered in the hard-sided suitcase.[1] The jurors returned to the courtroom, where they were allowed to view the evidence.[2] At approximately 2:20 p.m. the jury resumed their deliberations.

In their second note, which the Court received at 3:25 p.m., the jury requested information regarding the soft-sided suitcases which Feijoo–Tomala had in her possession when she returned from Ecuador.[3] The Court responded to that inquiry and deliberations resumed again at 3:30 p.m.

At 4:05 p.m., three and one half hours after deliberations had begun, the jury sent a note stating "[they] could not reach a unanimous decision."[4] When the Court recalled the jury to the courtroom at 4:10 p.m. they presented another note requesting that a portion of one government witness' testimony be reread. Before responding to the last note the Court gave a modified *Allen* charge instructing the jury:

"Now this case has been on trial, let me see, for three days, that's right, and the jury has been deliberating approximately about three and a half hours, is that right? [Foreman responded: Yes.] Now I do not believe that the case can be submitted to twelve men and women more intelligent and competent to decide it than you. In order to return a verdict in this case each juror must agree, as I previously told you. In other words, your verdict must be unanimous if there is to be a verdict. However, you only have to vote but you do not have to agree. In your deliberations jurors have a duty to consult one another, and to deliberate with a view to reaching an agreement if it can be done without violence to individual judgment. Although each juror must decide the case for himself, this should only be done after an impartial consideration of the evidence with his fellow jurors. In the course of

---

1. Trial Transcript, June 8, 1990 (hereinafter "TT") at 97. The transcript does not reflect the time the Court received the jury's note.

2. The cardboard inserts were not sent into the jury room because they were coated with a residue of cocaine.

3. TT at 100.

4. TT at 103.

your deliberations a juror should not hesitate to reexamine his own views and change his opinion if convinced it is erroneous. Each juror who finds himself to be in the minority should reconsider his views in the light of the opinion of the jurors of the majority. Conversely, each juror finding himself in the majority should give equal consideration to the views of the minority. No juror should surrender his honest conviction as to the weight or effect of the evidence for his fellow jurors or for the purpose of determining a verdict. But, remember, also, that after full deliberation and consideration of all the evidence, it is your duty to agree upon the verdict if you can do so, without violating your individual judgment and conscience. So I will ask you to retire and resume your deliberations for such time that in your conscientious judgment seems reasonable with the hope that you can conscientiously reach an agreement." [5]

At 4:16 p.m. the jurors returned to their jury room while counsel reviewed the trial transcript highlighting the testimony that would be read back to them. During this period the jury sent yet another note inquiring, "[W]hat is taking so long to read the transcript?" [6] At approximately 4:45 p.m. the witness' testimony was reread and the jury resumed deliberations.

Shortly after 5:00 p.m. the jury sent yet another note indicating that they were at an impasse and could not reach a unanimous verdict. [7] The following exchange then took place in open court.

The COURT: "Ladies and gentlemen, after I gave you this charge you only talked about ten or fifteen minutes and came back and gave me this note, which says, '[T]he jury doesn't think they will come to a unanimous decision.'

Well, I don't think you have given it enough opportunity to look it over. Maybe come back Monday. How is that? Would you like that? Sure. In other words, you have got to think of this.

This is a serious matter. Jury service is serious. Now, you have got to be free to reach your own opinion. If you can't, if it has to be that you cannot reach a unanimous verdict you can't do it. Certainly there is not going to be any pressure placed upon you to do so. But there is going to be a request that you seriously consider these issues involved because both parties are interested in that. As I said before, I don't believe that this case can be submitted to twelve men or women who are more intelligent or competent to decide upon it. Now, also I told you before that each juror who finds himself to be in the minority should reconsider his views in the light of the opinion of the jurors of the majority. Conversely, each juror finding himself in the majority should give equal consideration to the views of the minority. No juror should surrender his conscientious opinion, but we must give some time to it. We must expect, if possible, a unanimous verdict. Maybe you can't get it, but ten minutes, you can't make your mind up in ten minutes. But otherwise, we will come back Monday.

I have to be careful I don't want to know where you stand."

JUROR # 6: "The extreme is my opinion is extremes at each end. I don't think we are coming to an opinion."

The COURT: "... Please I don't want to know how you stand, how you are divided, if you are divided. I just want you to try, just try again.... Go back and see if you can reach some sort of conclusion. If you can't, I am not going to force you." [8]

At 5:15 p.m. the jury recommenced deliberations and at 5:45 p.m. they sent yet another note indicating that they remained deadlocked and that one of their number had to leave by 6:00 p.m. for religious reasons. At this juncture the Court informed counsel of its intention to declare a mistrial. Both the government and de-

---

5. TT at 103–105.

6. TT at 106.

7. TT at 108.

8. TT at 109–110.

fense counsel asked that the jury return Monday to continue their deliberations. In response, the Court noted that, although it was perfectly amenable to the idea of adjourning till Monday, it seemed a futile gesture inasmuch as the jury had earlier rebuffed that suggestion. The jurors returned to the courtroom at which time the following colloquy took place.

The COURT: [T]he real important issue is whether or not you can possibly come to a decision. Do you think you can come to a decision if you came here on Monday?

The FOREMAN: No.

The COURT: Anyone else think they can come to a decision if we have further deliberations Monday? Anyone think that? Is it possible? You believe.[9]

The FOREMAN: Agreed.

The COURT: Do you want to come in on Monday?

The FOREMAN: We were talking in the room we said Monday but then some people said also they wouldn't change their mind. *They wouldn't change their mind whatever happen* [sic]. (Emphasis added.)

The COURT: Members of the jury, I declare a mistrial because of your failure to get together.

The jury is hereby dispersed. They can go home and call the 1–800 number Sunday night and report next week.

Mr. CONCANNON [Defense Counsel]: If we have to report next week any way, if the juror has the

The COURT: I understand that but you heard me declare a mistrial.

Mr. CONCANNON: Yes, your honor.

The COURT: I have my reasons. I brought it out from this foreman that it doesn't look like they can ever get together. Is that right Mr. Foreman?

The FOREMAN: Yes.

The COURT: Is there any possibility of you getting together Monday?

JUROR # 6: I don't think so.

The COURT: The jurors are dispersed. It's a mistrial.[10]

## DISCUSSION

Essentially, Feijoo–Tomala claims that the Court's declaration of a mistrial was premature and unwarranted since the jury had deliberated only a short time and there were other alternatives available, i.e. returning the next business day to resume deliberations. Consequently, she argues, she was deprived of her valuable right to a verdict at a single trial, and a second trial would violate her rights under the Double Jeopardy clause of the Fifth Amendment.

*Double Jeopardy*

More than a century ago, in the preeminent case of *United States v. Perez*, 22 U.S. (9 Wheat.) 579, 6 L.Ed. 165 (1824), a unanimous Supreme Court resolved this issue when it held that where a mistrial is occasioned by a jury's failure to reach a verdict the Double Jeopardy clause of the Fifth Amendment does not bar a retrial. *Id.* at 580. Justice Story explained that the Double Jeopardy clause does not bar retrial because a declaration of mistrial, after a hung jury, is a "manifest necessity" to secure "the ends of public justice." *Id.; see also Arizona v. Washington*, 434 U.S. 497, 509, 98 S.Ct. 824, 830, 832, 54 L.Ed.2d 717 (1978) (a "trial judge's belief that the jury is unable to reach a verdict" is a "classic basis for a proper mistrial"); *United States v. Richardson*, 468 U.S. 317, 324–326, 104 S.Ct. 3081, 3085–3087, 82 L.Ed.2d 242 (1984) ("we have constantly adhered to the rule that a retrial following a 'hung jury' does not violate the Double Jeopardy clause"); *Oregon v. Kennedy*, 456 U.S. 667, 672, 102 S.Ct. 2083, 2087, 72 L.Ed.2d 416 (1982); (the hung jury is the prototypical example of manifest necessity); *Downum v. United States*, 372 U.S. 734, 736, 83 S.Ct. 1033, 1034, 10 L.Ed.2d 100 (1963) (the classic example of permissible retrials occurs when, without the defendant's consent, the jury has been discharged because they cannot agree); *Gori*

---

**9.** At this juncture, although the transcript does not reflect it, the Court paused to see if any of the jurors wished to comment.

**10.** TT at 112–113. The mistrial was declared at 5:47 p.m.

*v. United States,* 367 U.S. 364, 368, 81 S.Ct. 1523, 1526, 6 L.Ed.2d 901 (1961) ("where for reasons deemed compelling by the trial judge, ... the ends of substantial justice cannot be attained without discontinuing the trial, a mistrial may be declared without the defendant's consent and even over his objection, and he may be retried consistently with the Fifth Amendment"); *United States v. Ustica,* 847 F.2d 42, 48 (2d Cir.1988); *Lindsey v. Smith,* 820 F.2d 1137, 1155 (11th Cir.1987), *cert. denied* 489 U.S. 1059, 109 S.Ct. 1327, 103 L.Ed.2d 595 *reh'g denied* —— U.S. ——, 109 S.Ct. 1771, 104 L.Ed.2d 206 (1989); *United States v. Salvador,* 740 F.2d 752, 755 (9th Cir.1984), *cert. denied* 469 U.S. 1196, 105 S.Ct. 978, 83 L.Ed.2d 980 (1985); *Walker v. Weldon,* 744 F.2d 775, 778 (11th Cir.1984); *United States v. Beckerman,* 516 F.2d 905, 908 (2d Cir.1975); *United States v. Khait,* 643 F.Supp. 605, 606 (S.D.N.Y.1986).

"The trial court is in the best position to assess all the factors which must be considered in making a necessarily discretionary determination whether the jury will be able to reach a just verdict if it continues to deliberate." *Arizona v. Washington,* 434 U.S. at 510 n. 28, 98 S.Ct. at 833 n. 28; *see also Gori v. United States,* 367 U.S. at 368, 81 S.Ct. at 1526. Although there is no talismanic point to demarcate the instant at which a viable jury capable of reaching a unanimous verdict becomes a hopelessly deadlocked jury, numerous relevant factors have been identified, including the length of the trial, the complexity of the issues involved, the length of time the jury has deliberated, whether the defendant has timely objected to the mistrial, and the effects of exhaustion or coercion. *Arnold v. McCarthy,* 566 F.2d 1377, 1387 (9th Cir. 1978) (citations omitted). However, the jury's own statement that it is unable to reach a verdict is the most crucial factor. *United States v. Lorenzo,* 570 F.2d 294, 299 (9th Cir.1978); *United States v. Lansdown,* 460 F.2d 164, 170 (4th Cir.1972).

This was a rather brief trial, lasting approximately three days, in which a total of seven witnesses were called. Moreover, this was not a complex case, either in terms of the facts or the law. The jury, quite simply, had to decide one issue—was Feijoo–Tomala an innocent dupe who did favors for strangers, if you believed her defense, or was she a drug smuggler. Furthermore, based on the nature of the jury's early notes there seemed to be no confusion with respect to the law as charged by the Court.

The fact that a mistrial is declared after the jury has deliberated for a relatively short period of time does not *ipso facto* warrant a conclusion that the Court acted improvidently. *See Lindsey v. Smith,* 820 F.2d at 1155 (mistrial declared after jury deliberated for three hours and sent two notes indicating their inability to reach a unanimous verdict); *United States v. Lorenzo,* 570 F.2d at 299 (declaring a mistrial after jury deliberated for a little over three hours in a brief trial which presented no complex questions of fact and then indicated they were unable to reach a verdict was not an abuse of discretion); *United States v. Beckerman,* 516 F.2d at 908 (declaring a mistrial after jury deliberated approximately seven hours following a three day trial on a one count indictment charging defendant with possession and intent to distribute narcotics was not an abuse of discretion); *United States v. Brahm,* 459 F.2d 546 (3rd Cir.), *cert. denied,* 409 U.S. 873, 93 S.Ct. 205, 34 L.Ed.2d 125 (1972) (declaring a mistrial after jury deliberated five hours in a two day trial was not an abuse of discretion). Simply put, "[t]here is no minimum amount of time which a jury must spend in deliberations before a mistrial can be declared." *Arnold v. McCarthy,* 566 F.2d at 1387 (declaring mistrial after jury deliberated 12 hours following a brief trial of "ordinary complexity", was not an abuse of discretion).[11]

11. In certain circumstances trial courts have abused their discretion by declaring a mistrial when the jury has deliberated for a relatively brief period. *United States v. Horn,* 583 F.2d 1124, 1129 (10th Cir.1978); *United States ex rel.*

*Webb v. Court of Common Pleas,* 516 F.2d 1034 (3rd Cir.1975); *United States v. Gordy,* 526 F.2d 631, 636 (5th Cir.1976). The defendant's reliance on these cases, however, is misplaced. In *Horn,* the judge declared a mistrial after the jury

While exhaustion was not a concern, the possibility of coercion was very real. Although the Defendant has a "valued right to have h[er] trial completed by a particular tribunal," *Wade v. Hunter,* 336 U.S. 684, 689, 69 S.Ct. 834, 837, 93 L.Ed. 974 (1949), that right is not absolute and "must in some instances be subordinate to the public's interest in fair trials designed to end in just judgments." *Id.* 69 S.Ct. at 837. The Court must guard against "the significant risk that a verdict may result from pressures inherent in the situation rather than the considered judgment of all the jurors." *Arizona v. Washington,* 434 U.S. at 509, 98 S.Ct. at 832; *United States v. See,* 505 F.2d 845, 853 (9th Cir.1974), *cert. denied* 420 U.S. 992, 95 S.Ct. 1428, 43 L.Ed.2d 673 (1975). Had the Court exhorted the jury to return Monday, it would have been sending the not so subtle message that a verdict, at any price, was the only acceptable resolution. Such an action would have prodded some jurors to surrender their conscientious belief in order to reach a unanimous verdict. The consequence being, that the Court would not have been true to itself, or our system of jurisprudence.

Lastly, with respect to the jury's own statement of their deadlock, the Court was persuaded by (1) the three notes sent by the jury indicating that they were deadlocked—two of which came after an *Allen* charge had been given; and (2) the fact that when the Court asked whether "[a]nyone [on the jury thought] they could come to a decision if we have further deliberations Monday? Anyone think that? Is it possible?", eleven jurors remained silent while the Foreman emphatically responded, "No." [12] The confluence of all of these factors was sufficient to convince the Court that the jury was hopelessly deadlocked.

In closing, the Court notes that Defendant's allegation that it did not consider any alternatives prior to declaring a mistrial is unsupported. In fact the Court did consider the very alternative Defendant suggests, i.e., resuming deliberations on Monday. The jury unequivocally rejected this option.

## CONCLUSION

For the aforementioned reasons Defendant's motion to dismiss the indictment pursuant to the Double Jeopardy Clause of the Fifth Amendment is DENIED.

SO ORDERED.

---

deliberated for approximately five hours. However, unlike the instant case, prior to declaring a mistrial, the *Horn* court did not inquire of the entire panel, in open court and on the record, whether or not they thought they could reach a verdict. The trial judge's failure to make such an inquiry was a critical factor in the Second Circuit's decision that the mistrial should not have been declared. Similarly, in *Gordy,* the Fifth Circuit deemed the trial court's declaration of a mistrial premature because the "court's communications with the jurors prior to discharge were too inconclusive to demonstrate the existence of a 'manifest necessity' to terminate the trial." *Gordy,* 526 F.2d at 636. The instant case is simply not analogous. The record reveals that there was a thorough exchange between the Court and the jury which conclusively demonstrated the latter's inability to reach a unanimous verdict. The instant case is also readily distinguishable from *Webb* where the trial court *sua sponte* raised the issue of deadlock and dismissed the jury.

12. Defense counsel did timely make known his objection to the Court's declaration of a mistrial.