[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 12-10938
_____

D.C. Docket No. 1:11-cr-20678-KMM-1

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

ROBERT DAVIS,
a.k.a. Rob,

Defendant - Appellant.

_____

Appeals from the United States District Court
for the Southern District of Florida

_____

(February 12, 2013)

Before CARNES and COX, Circuit Judges, and RESTANI,[*] Judge.

CARNES, Circuit Judge:

The defendant himself described the events leading up to this appeal when he told the judge, "Sir, I don't see how you're going to go forward with this trial. It's turmoil." But there was more than just turmoil. With two troubled jurors wanting to be excused and no alternates to replace them, and with a problem defendant stirring the brew, there was "[d]ouble, double, toil and trouble."[1] The pot began to simmer in jury selection and boiled over during the trial, after jeopardy had attached. The double trouble produced a mistrial over the defendant's objection, raising the specter of double jeopardy.

## I.

Robert Davis and five codefendants were charged in a 16-count indictment with various offenses arising out of their participation in seven armed robberies.[2] After Davis' trial was severed from those of his codefendants, jury selection began. The district court advised the prospective jurors that they would be required to

---

[*] Honorable Jane A. Restani, United States Court of International Trade Judge, sitting by designation.

[1] William Shakespeare, Macbeth, act 4, sc. 1.

[2] Specifically, Davis was charged with conspiracy to interfere with commerce by threats or violence by committing a Hobbs Act robbery; seven counts of substantive Hobbs Act robbery for committing armed robberies at a Shell gas station, a Family Dollar store, the Doral Ale House, a Farm Store, two CVS pharmacies, and a Wendy's restaurant; seven counts of using and carrying a firearm in connection with each of the robberies; and one count of being a previously convicted felon in possession of a firearm and ammunition.

serve from 9 a.m. to 5 p.m. each day and asked if any of them could not do that. Danella Bedford, a dance instructor, told the court that she would have a problem serving during that time because she was paid by the hour and would not be paid unless she was at work.  Later, when the court asked if there was any other reason why a person could not serve as a juror, Virgena Clerjuste raised her hand and responded, "My English is not perfect," which proved to be an understatement.

Davis' counsel tried to strike Bedford for cause because she had indicated that jury service would cause her a financial hardship, but the court would not excuse her on that basis and Davis' counsel did not use a peremptory challenge to remove her.  Clerjuste was seated on the jury without objection or motion from either party.  A jury of twelve was ultimately empaneled, but after removal of some venire members for cause and others through peremptory strikes there were none left to serve as alternates.  The court expected that barely enough jurors would be enough but that expectation proved to be more hopeful than realistic.

The trial began and the Assistant United States Attorney gave his opening statement to the jury.  Then the proceedings were halted because Davis had given his counsel a pro se motion that he wanted presented to the court.  The problem was that the court would not accept the motion from Davis himself because he was represented by counsel, and Davis' counsel refused to file the motion for reasons he explained to his client off the record.  That problem led to Davis telling the

3

court that he was not satisfied with his two appointed counsel and wanted to represent himself. The court advised Davis against doing that, but he insisted. After the court conducted a colloquy as required by Faretta v. California, 422 U.S. 806, 95 S.Ct. 2525 (1975), Davis was allowed to represent himself. Davis did agree with the court's suggestion that he allow his appointed counsel to serve as standby counsel for him during the trial. Throwing another problem into the pot, Davis also told the court that he wanted to go back to his cell for the remainder of the trial, and he turned down an offer that would have allowed him to monitor the proceedings from his cell.

Recognizing the difficulty of the issues raised by Davis' desire to absent himself from the trial, the court recessed for an early lunch break to do some research and decide how to proceed. During the recess more problems bubbled to the surface. As other jurors were leaving the courtroom, juror Bedford asked to speak privately with the judge. She was permitted to do so and told the judge that she felt that "the financial burden is going to be too much to be here for these days." The judge responded that he had already considered that problem when she mentioned it during voir dire. But Bedford persisted, protesting that she would lose about $1000 in income and was seriously concerned about her finances.

The court then asked counsel to approach for a sidebar discussion, although Davis stayed behind and was not present for the discussion. Bedford explained to

4

the court and to the attorneys that she worked for a dance conservatory, and because of the hours she needed to be at work she was only available to serve as a juror until 12:30 in the afternoon. The court asked one of Davis' standby counsel if he had a response, and he responded that he was "in an awkward position" because he wasn't sure if he was still representing Davis.

The court then asked Bedford to step aside so that juror Clerjuste, who had also remained in the courtroom when the other jurors went to lunch, could approach. Clerjuste told the court, "Like I said, I don't understand a lot of things. My English is not really good. This is something that I don't understand but--" The court cut her off by asking if she had been able "to understand our questions," and she responded, "Not everything." The court then asked the AUSA if he had anything to say about that problem, and he suggested selecting two replacement jurors and some alternates, even though the trial had begun. Although there were no members of the original jury venire left to choose from, the deputy clerk informed the court that twelve new prospective jurors could be brought in by 2:00 that afternoon.

The court then spoke with Davis, telling him that "two jurors have indicated . . . one for financial reasons . . . and one for language reasons, that they don't think they can continue to serve as jurors." The court asked if Davis or the AUSA had a response, and Davis said that he did not. The AUSA again suggested finding

5

replacement jurors.  The court said that it was inclined to do that, but asked Davis

if he would agree to proceeding with a jury of fewer than twelve members.  He

objected to doing so.  The attorneys and judge then broke for lunch.

After they returned to the courtroom following lunch, the court spoke with

Davis and counsel for both sides outside the presence of the jury:

> I haven't had a chance to speak with anybody, counsel for either side or the defendant, but you know, given the posture of the case when last we left, we had two jurors ask to come to sidebar, one of them virtually in tears or on the verge of tears, explaining that her jury service would cause significant financial hardship to her.  I can't remember exactly what her words were . . . but it was to a degree that at least in my observation she was not going to be focused on the trial and was going to not have the degree of concentration that I think would be necessary to be a fair and impartial and qualified juror.
>
> The other juror indicated that she was having a problem understanding the proceedings because of the language barriers, and for that reason, I think it was necessary to excuse both of the jurors which leaves us with 10 jurors; and because of the number of jurors that had been called and the number of jurors that have been excused for cause or for peremptory challenges, we were not able to select any alternate jurors.
>
> I raised with Mr. Davis the possibility of whether he would consent to a jury of 11 and he indicated that he would not and I'm not sure that even had he agreed, it would make a difference since we didn't have 11 jurors anyway.
>
> I considered calling in additional jurors to see if we could impanel additional jurors to have a panel of 12 with alternates, but over the lunch hour, it seems to me that it's probably not a good alternative, because we had opening statements or an opening statement from the government.

6

Davis interjected that he didn't think it was "in [his] best interest to re-elect two more jurors."

The court agreed with Davis, and told him that "the only alternative that we can proceed on then is, because of the absence of a jury of 12, is to declare a mistrial and begin jury selection again with a new jury tomorrow."  Davis objected to the mistrial on the ground that it would violate the Double Jeopardy Clause. The court noted his objection, and ordered the parties to reconvene to start the trial over the next day "with [a] clean slate."  The court and the parties understood that the court had declared a mistrial.

Davis' standby counsel immediately filed a motion to dismiss the indictment under the Double Jeopardy Clause, arguing that no manifest necessity had existed for a mistrial.  The court denied the motion.  In doing so, the court first explained that it had excused juror Bedford because when she approached the sidebar, "the level of her being distraught . . . led [the court] to conclude that this was not a juror that was going to be able to focus and give the trial and the evidence presented the attention it deserved. . . . It serves no purpose to have a juror who is distracted . . . [by] her financial circumstances."

As to juror Clerjuste, the court said:

[W]hen a juror . . . [says] that [she] can't understand the proceedings, and bear in mind that when she came to us the second time, it had gone beyond some of the preliminary voir dire, the general voir dire. So, she had an opportunity to participate more in the proceedings to

7

the point that she felt that she could not continue, and I don't know if the fact that she had now been present during the opening statement of the government counsel and perhaps concluded that she was not able to follow his otherwise erudite opening, that she felt obligated to bring it to the court's attention.

The court reasoned that where two jurors are unable to serve and the defendant himself has objected to a jury of less than twelve, "manifest necessity is present because there is no other alternative."

This is Davis' interlocutory appeal of the court's denial of his motion to dismiss the indictment on double jeopardy grounds. See United States v. Benefield, 874 F.2d 1503, 1505 (11th Cir. 1989) ("A denial of a motion to dismiss based on double jeopardy grounds is an appealable final order.").

## II.

Davis contends that the district court's decision to declare a mistrial had not been based on a manifest necessity and, as a result, that the court should have granted his motion to dismiss the indictment because a second trial would violate the Double Jeopardy Clause. We review the district court's denial of Davis' motion to dismiss the indictment only for abuse of discretion, United States v. Chica, 14 F.3d 1527, 1530 (11th Cir. 1994), but if the court's decision to declare a mistrial was not based on manifest necessity, it was an abuse of discretion not to dismiss the indictment on double jeopardy grounds. United States v. Butler, 41 F.3d 1435, 1441–42 (11th Cir. 1995).

8

The Fifth Amendment provides that "[n]o person shall . . . be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. Amend. V. "Jeopardy attaches when the jury is empaneled and sworn," and "[f]rom that point forward, the defendant has a constitutional right, subject to limited exceptions, to have his case decided by that particular jury." Chica, 14 F.3d at 1531 (alterations, quotation marks, and citations omitted). One of those exceptions applies when "taking all the circumstances into consideration, there [was] a manifest necessity for the [mistrial], or the ends of public justice would otherwise [have been] defeated" by continuing the trial. United States v. Perez, 22 U.S. 579, 580 (1824). The manifest necessity doctrine "is designed to accommodate the defendant's right to have his trial completed by the first competent tribunal with the public's interest in fair trials designed to end in just judgments." United States v. Gordy, 526 F.2d 631, 635 (5th Cir. 1976) (quotation marks omitted).

Partly because this doctrine accommodates competing interests, the term defining the doctrine is not to be defined literally. See id. The Supreme Court has instructed us that while "manifest necessity" describes the magnitude of the government's burden, it is "not . . . a standard that can be applied mechanically or without attention to the particular problem confronting the trial judge," and "the key word 'necessity' cannot be interpreted literally." Arizona v. Washington, 434 U.S. 497, 506, 98 S.Ct. 824, 830–31 (1978). In other words, this is not a

dictionary-defined doctrine, but a decision-defined one with the result depending on the circumstances of each individual case.  See also Chica, 14 F.3d at 1531 ("Whether manifest necessity exists is a fact-intensive inquiry, and is not susceptible to a mechanical formulation.")  (quotation marks and citations omitted).   Our task is to decide whether the district court exercised "sound discretion" in declaring a mistrial, Washington, 434 U.S. at 514, 98 S.Ct. at 835, and in order to determine that "we review the entire record in the case without limiting ourselves to the actual findings of the trial court."  Chica, 14 F.3d at 1531 (alteration and quotation marks omitted).

Important to our inquiry in this case is Federal Rule of Criminal Procedure 23(b).  That rule requires that a jury be composed of twelve people, subject to only two exceptions that apply before deliberations begin.  Fed. R. Crim. P. 23(b).  One of those exceptions is that the parties may before trial stipulate in writing to a jury of fewer than twelve, Fed. R. Crim. P. 23(b)(2)(A), and the other is that after the trial begins they may stipulate in writing to a jury of fewer than twelve if the court finds it necessary to excuse a juror "for good cause," Fed. R. Crim. P. 23(b)(2)(B).  See also Fed. R. Crim. P. 23 advisory committee notes.  Unless one of those two exceptions applies, a federal criminal case cannot be submitted for decision to a jury with fewer than twelve members.

Because of Rule 23(b), the trial in this case could not continue with fewer than twelve jurors unless Davis gave his written consent.  He did not consent.  He objected.  And because there were no alternate jurors, the trial could not continue once any juror was excused without a replacement juror.  The court explained that it was not a good idea to empanel more jurors because the AUSA had already made an opening statement.  Davis agreed, stating:  "About the two jurors, jeopardy is attached when jurors are sworn in.  I'm entitled to those twelve jurors.  So, I don't feel that's in my best interest to re-elect two more jurors."

Davis does not contest the point that once jurors Bedford and Clerjuste, or either one of them, were excused there was manifest necessity for a mistrial, nor could he sensibly contest that point after affirmatively asserting his right not to be tried by a smaller jury and insisting that he did not want any new jurors empaneled.  When Bedford and Clerjuste walked out of the courtroom, the possibility of a twelve-member jury walked out with them.  And when Davis objected to proceeding with fewer than twelve jurors and insisted that it was not in his best interest for the court to empanel any more, a mistrial was the only possible result, which is to say it was necessary not only in the doctrinal sense but even in the dictionary sense.

If Davis' argument contested that conclusion, it might with a little license be said to resemble "a tale told by an idiot" that is full of nothing more than "sound

and fury."[3] But his argument is better than that, even if it does end up "signifying nothing" that resembles reversible error. Davis' argument is that the decision to be judged against the manifest necessity standard is not the declaration of a mistrial but the decision to excuse the two jurors which required it. Instead of contesting the necessity of the mistrial itself, he contests the necessity of the actions that made the mistrial necessary. He dresses up his argument in the language of the two actions being "intertwined," but its essential point is that once the court took the first action (excusing the jurors), the second (declaring a mistrial) was preordained.

Davis' syllogisms do not flow well, because the removal of the jurors alone did not cause the mistrial. What caused the mistrial was the removal of the jurors plus Davis' objection to proceeding with a smaller jury. And Davis' argument assumes that the focus can be shifted from necessity of the mistrial itself to the necessity of one of the two actions (the court's excusing the jurors) that combined with his own actions (his objecting to a smaller jury and opposing empanelment of additional jurors) made the mistrial a necessity. Maybe it can be, or maybe it cannot be. We need not decide because, even indulging Davis' premise that his insistence on a jury of twelve does not matter, and also indulging his premise that the manifest necessity question should be asked about the action that reduced the jury to fewer than twelve members, he still loses.

---

[3] William Shakespeare, <u>Macbeth</u>, act 5, sc. 5.

A.

The decision to remove a juror is generally "entrusted to the sound discretion of the trial judge whenever facts are presented which convince the trial judge that the juror's ability to perform [her] duty as a juror is impaired." United States v. Fajardo, 787 F.2d 1523, 1525 (11th Cir. 1986) (quotation marks omitted). As we just discussed, Davis argues that we must review the dismissals of Clerjuste and Bedford for manifest necessity because those decisions – along with his objections to using any replacement jurors and to proceeding with fewer than twelve jurors – made the mistrial inevitable. Assuming that Davis is correct, his argument still fails because the dismissal of Clerjuste was manifestly necessary.

Although Davis asserts that the court's discussion with Clerjuste was "perfunctory," and that "more was required to establish that [she] could not continue to serve for language reasons," it is hard to imagine what more Clerjuste could have said or done to show that she could not continue as a juror. She had already made the court aware of a potential language barrier during voir dire. Then she voluntarily approached the court after the government's opening statement, telling the judge several times that she could not understand the proceedings. She told the court, "I don't understand a lot of things," and "[t]his is something that I don't understand." The court asked her if she had been able "to understand our

13

questions," and she responded, "Not everything." It is, of course, important that jurors be able to understand everything that is said during a trial.

Davis further contends that Clerjuste's "bald statement about lacking English language proficiency is not dispositive" because she was able to understand and answer questions during voir dire. While Davis might be correct that Clerjuste demonstrated some proficiency in English during voir dire, that does not mean that the court erred in finding that she could not understand the English language well enough to continue as a juror. During voir dire prospective jurors had been required to answer only basic questions about their backgrounds, such as their name, marital status, and occupation. As the district court explained, when Clerjuste brought her language problem to the court's attention for the second time, the proceedings had gone beyond voir dire. The government had made its opening statement discussing this sixteen-count indictment case, which involved seven separate robberies. And, as the court noted, it may have been that "erudite opening" that convinced Clerjuste that she could not continue. For whatever reason, Clerjuste did take the initiative in informing the court that she could not understand "a lot of things." Under the circumstances, we cannot say that the district court's decision to dismiss Clerjuste from the jury was anything short of manifestly necessary.

14

Just how manifestly necessary it was is shown by the only proposal Davis has been able to come up with about how Clerjuste could have been kept on the jury notwithstanding her serious problems understanding English. He contends that instead of dismissing her the court could have had Clerjuste raise her hand every time she did not understand something, which could then be explained to her, presumably in simpler English (or maybe hand gestures?). That suggestion is obviously not feasible, especially in a trial involving multiple crimes and multiple charges including one count of conspiracy to commit armed robbery, seven substantive counts of armed robbery of seven different businesses, seven counts of carrying and using a firearm in connection with those robberies, and one count of being a felon in possession of a firearm. Who would do the explaining during the trial? What if one side or the other objected to the explanation? And who would have the job of explaining things in simpler terms when Clerjuste raised her hand during deliberations?[4]

Because the dismissal of Clerjuste was manifestly necessary, we do not reach the court's dismissal of Bedford. As we have already discussed, the trial could not proceed with fewer than twelve jurors unless Davis stipulated to that in

_____

[4] Davis contends that the district court erred in excluding him from the sidebar discussion about the Clerjuste problem, because he was representing himself at that point and was not able to suggest alternatives to dismissing her. Even if it were error to "exclude" Davis from the sidebar (the record shows that counsel were invited but not that Davis was instructed to stay away), it was harmless error. Since the sidebar, Davis and his appellate counsel have had months to come up with plausible alternatives to dismissing Clerjuste from the jury, and they have not been able to do so.

15

writing, which he did not.  See Fed. R. Crim. P. 23(b).   Even if the court had not excused Bedford, the dismissal of Clerjuste would still have resulted in a jury of fewer than twelve, rendering moot any error as to the dismissal of Bedford.  A mistrial is a mistrial whether declared because the jury is short one member or two.  And, for the reasons we have discussed, this was not just a mistrial but a manifestly necessary one.  The district court did not abuse its discretion in refusing to dismiss the indictment on double jeopardy grounds.

### B.

Davis also contends that the district court failed to comply with the notice and consultation requirement of Federal Rule of Criminal Procedure 26.3 before declaring a mistrial.  That rule requires that "[b]efore ordering a mistrial, the court must give each defendant and the government an opportunity to comment on the propriety of the order, to state whether that party consents or objects, and to suggest alternatives."  Fed. R. Crim. P. 26.3.  However, we have held that compliance with Rule 26.3 is only one factor to be considered in determining whether a trial judge exercised sound discretion in declaring a mistrial.  United States v. Berroa, 374 F.3d 1053, 1058 (11th Cir. 2004) ("Consistent with the manifest necessity test, the extent to which a Rule 26.3 violation indicates a lack of sound discretion must be considered and resolved based upon the individual and varying circumstances of each case.").

16

By the time the district court declared the mistrial, Davis himself had been given an opportunity to address whether one should be declared, and he had been given an opportunity to object.  He did express his views and he did object.  Davis had already objected to proceeding with fewer than twelve jurors and to empaneling new jurors.  Apparently, the only alternative that would satisfy him was to use the twelve original jurors.  That was impossible, because the district court had already determined that Clerjuste could not understand English well enough to serve.  Even though the court could have conducted a more formal or structured colloquy with Davis before declaring a mistrial, given the circumstances its failure to do so was not reversible error.

This case having strutted and fretted its hour upon the appellate stage, we conclude that the curtain should be dropped, at least on this Act of it.

**AFFIRMED.**