[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 16-12978

_____

D.C. Docket No. 8:14-cr-00521-JDW-AEP-1

USA,

Plaintiff - Appellee,

versus

EDWARD NEIL FELDMAN,
KIM XUAN FELDMAN,

Defendants - Appellants.

_____

Appeals from the United States District Court
for the Middle District of Florida

_____

(August 30, 2019)

Before JILL PRYOR and JULIE CARNES, Circuit Judges, and ANTOON,[*]
District Judge.

_____

[*] Honorable John Antoon II, United States District Judge for the Middle District of
Florida, sitting by designation.

JULIE CARNES, Circuit Judge:

Following a jury trial, Defendants Dr. Edward Feldman and his wife Kim Feldman appeal their convictions for conspiring to distribute controlled substances without a legitimate medical purpose, conspiring to commit money laundering, and three counts of illegal monetary transactions.  Dr. Feldman was also convicted of three counts of distributing controlled substances, without a legitimate medical purpose, to three individuals resulting in their deaths.  Both Defendants raise various challenges to their convictions on appeal.  Dr. Feldman also challenges his 300-month sentence, which incorporated a 20-year mandatory-minimum penalty pursuant to 21 U.S.C. § 841(b)(1)(C).  After careful review of the parties' briefs and with the benefit of oral argument, we affirm both Defendants' convictions, but vacate Dr. Feldman's sentence.

## BACKGROUND

### I.    Facts

#### A.    The Clinic

This case involves the operation of a pain-management clinic in Florida: Feldman Orthopedic and Wellness Center.  The clinic was operated by Dr. Feldman, a physician, along with his wife, who served as the clinic's office manager and handled all of the clinic's money.  The clinic did not accept insurance.  To obtain an office visit, patients paid $300 in cash or credit for their

2

first visit and $150 for each follow-up visit.  Patients were provided a discount for referring new patients to the clinic.  Office visits with Dr. Feldman were typically brief, as he usually performed cursory examinations—or sometimes no examination at all.

Dr. Feldman was the only physician at the clinic's first location on 38th Avenue, where he saw approximately 40 to 100 patients per day.  According to one former employee, the clinic's patients came from out of state and often appeared "stoned" and "drunk."  One of the clinic's former patients, Mike Shaw, testified that he came to the clinic because Dr. Feldman was a "writer," meaning that he would prescribe any medication suggested by the patient.  The clinic sometimes received phone calls from concerned family members of patients suffering from addiction, yet Dr. Feldman did not treat those patients any differently.

In July 2010, the clinic moved to 66th Street, where Dr. Feldman began seeing 75 to 150 patients per day.  Due to heavy law enforcement presence at this location, the Feldmans instructed their staff to stop accepting patients from out of state.  They also told their staff to place notes in the patient files if they suspected that someone was an undercover law enforcement officer.  If a patient was flagged as an undercover officer, Dr. Feldman conducted a more extensive physical and did not prescribe those patients any controlled substances.  Based on his belief that

3

sunglasses and hats could conceal recording devices, Dr. Feldman banned these items at the clinic's third and final location on Park Boulevard.

In an effort to tighten protocol, the Feldmans also instructed staff to discharge patients whose urine tested positive for cocaine or other serious drugs. In addition, the clinic began utilizing the Prescription Drug Monitoring Database— a database that shows the prescriptions a patient has previously obtained and serves as a tool for determining whether patients are doctor shopping. Notwithstanding the above gestures, Mrs. Feldman ultimately told staff to stop conducting urinalysis screenings because too many patients were being discharged based on those results. Moreover, the Feldmans decided that no patient would be discharged until Dr. Feldman had himself reviewed that patient.

In January 2011, a second doctor, Dr. Nancy Bruemmer joined the clinic. Dr. Bruemmer often recommended lowering patients' dosage of medications or discharging them altogether. Whenever Dr. Bruemmer made these recommendations, however, Mrs. Feldman made sure that Dr. Feldman saw these patients before they were discharged.

In early 2011, law enforcement officers began investigating Dr. Feldman's clinic. As part of the investigation, several undercover officers posed as patients at the clinic. Dr. Kevin Chaitoff, a physician who specializes in pain management and anesthesia, reviewed the transcripts from the undercover officers' visits to the

4

clinic and determined that there were several problems with the way Dr. Feldman handled each visit. Specifically, Dr. Chaitoff determined that Dr. Feldman obtained inadequate patient histories, conducted inadequate physical examinations, and prescribed controlled substances without documented justification.

In August 2012, law enforcement officers executed a search warrant at the clinic and seized 3,200 patient files. At the request of Brian Zdrojewski, an agent with the Drug Enforcement Administration, Dr. Chaitoff randomly selected 30 patient files to review in order to determine whether Dr. Feldman was operating within the usual course of professional practice with respect to each patient. Dr. Chaitoff concluded that none of the patients in the files he reviewed had been prescribed controlled substances for a legitimate medical purpose. Dr. Chaitoff was later asked to review an additional 18 patient files and he reached the same conclusion as to those files. The investigation revealed at least three patients of Dr. Feldman's who had died while under his care: Joey Mayes, Shannon Wren, and Ricky Gonzalez. Dr. Chaitoff reviewed the files of these patients and determined that Dr. Feldman's treatment of them was not within the usual course of professional practice.

B.    Money Laundering

The investigation also revealed that between 2010 and 2014, the Feldmans deposited approximately $6,787,103.99 into 37 bank accounts—the majority of

5

which came from cash deposits that were less than $10,000.  John Barna, a retired

detective with the Pinellas County Sheriff's Office, determined that the Feldmans

purchased their home on Trilby Avenue, in part, with $190,000 from a savings

account in Dr. Feldman's name at JPMorgan Chase Bank.  Records showed that of

that $190,000, $150,000 was transferred from the clinic's bank account in $50,000

increments.  That transfer is the subject of Count 6.  At issue in Count 7, is a

$150,000 wire transfer from First Bank Creve Coeur Mark Lewis P.A. Trust

Account that Dr. Feldman used to fund the clinic location on Park Boulevard.

Finally, the subject of Count 8 is a wire transfer in the amount of $187,689.50 from

a Merrill Lynch account in Dr. Feldman's name to one in Mrs. Feldman's name.

## II.    Procedural History

A federal grand jury subsequently issued an indictment charging the

Feldmans with:  (1) conspiring to distribute and dispense controlled substances—

primarily oxycodone and methadone, which are Schedule II controlled substances,

and alprazolam and diazepam, which are Schedule IV controlled substances—not

for a legitimate medical purpose, in violation of 21 U.S.C. §§ 841(b)(1)(C), (b)(2)

and 846 (Count 1); (2) conspiring to commit money laundering, in violation of 18

U.S.C. § 1956(h) (Count 5); and (3) engaging in monetary transactions with

criminal derived property exceeding the value of $10,000, in violation of 18 U.S.C.

§ 1957 (Counts 6 through 8).  Dr. Feldman was also charged with three substantive

counts of distribution and dispensation of Schedule II and Schedule IV controlled substances, not for a legitimate medical purpose, resulting in the deaths of Joey Mayes (Count 2), Ricky Gonzalez (Count 3), and Shannon Wren (Count 4), in violation of § 841(a)(1), (b)(1)(C) (Counts 2 through 4).

The Feldmans pled not guilty and proceeded to trial. The first trial ended in a mistrial. At the second trial, the Government presented testimony from the case agents, undercover officers, former patients and employees, the medical examiners, and Dr. Chaitoff. At the close of the Government's case-in-chief, the Feldmans moved for judgment of acquittal. Dr. Feldman argued that the Government failed to meet its burden of proof as to each count. The district court denied the Feldmans' motions for judgment of acquittal.

Dr. Feldman called several witnesses on his behalf. Dr. Simopoulos, a pain management physician, testified that, based on his review of the patient files, he believed that Dr. Feldman's prescribing practices were within the usual course of professional practice. Dr. Vernard Adams, a forensic pathologist and former medical examiner, opined about the cause of death for each of the three victims. Dr. Feldman also testified. He denied that he had an agreement with Mrs. Feldman or anyone else at the clinic to engage in illegal activity. After the defense rested, the district court denied the parties' renewed motions for judgment of acquittal.

The jury found the Feldmans guilty as charged.  The district court sentenced Dr. Feldman and Mrs. Feldman to imprisonment terms of 300 months and 48 months, respectively.  Dr. Feldman's 300-month sentence incorporated the 20-year mandatory minimum sentence under 21 U.S.C. § 841(b)(1)(C), based on his convictions for Counts 2 through 4.[1]  This appeal followed.

## DISCUSSION

### I.    Motion to Sever

Mrs. Feldman argues that the district court abused its discretion by denying her motion to sever her trial from Dr. Feldman's.

We review the district court's denial of a motion for severance for an abuse of discretion.  *United States v. Cobb*, 185 F.3d 1193, 1196 (11th Cir. 1999).  If it appears that a joint trial will prejudice a defendant or the Government, the district court may sever the defendants' trials.  Fed. R. Crim. P. 14(a).  "In assessing the merits of a severance motion, the district court must balance the possibility of prejudice to the defendant against the public interest in judicial efficiency and economy."  *United States v. Eyster*, 948 F.2d 1196, 1213 (11th Cir. 1991).  To obtain reversal of a district court's denial of a severance motion, a defendant must make a showing of "compelling prejudice" against which the district court offered

---

[1]  Dr. Feldman received ten-year concurrent sentences on each of his other five counts of conviction.

8

no protection.  *United States v. Walser*, 3 F.3d 380, 385 (11th Cir. 1993).  "A defendant can show compelling prejudice by demonstrating that the jury was unable to sift through the evidence and make an individualized determination as to each defendant."  *United States v. Ramirez*, 426 F.3d 1344, 1352 (11th Cir. 2005) (quotation marks omitted).

Prior to trial, Mrs. Feldman moved to sever Counts 2 through 4—which charged Dr. Feldman with distributing and dispensing controlled substances, without a legitimate medical purpose, resulting in death.  She argued that she would be substantially prejudiced by a joint trial that included those counts because they applied to Dr. Feldman only.  The district court denied the motion.

Mrs. Feldman has not met her burden of showing that the district court abused its discretion by denying her motion for severance.  The Feldmans were indicted together and charged with being part of two conspiracies:  (1) the distribution of controlled substances without a legitimate medical purpose; and (2) money laundering.  "It is well settled that defendants who are indicted together are usually tried together."  *United States v. Browne*, 505 F.3d 1229, 1268 (11th Cir. 2007); *see also United States v. Knowles*, 66 F.3d 1146, 1158 (11th Cir. 1995) ("This court is reluctant to reverse a district court's denial of severance, particularly in conspiracy cases, as generally 'persons who are charged together should also be tried together.'").

9

Mrs. Feldman asserts that she was prejudiced by the admission of evidence relating to Counts 2 through 4 because those counts applied only to Dr. Feldman. We have concluded, however, that "[a] defendant does not suffer compelling prejudice, sufficient to mandate a severance, simply because much of the evidence at trial is applicable only to co-defendants." *United States v. Schlei*, 122 F.3d 944, 984 (11th Cir. 1997) (quotation marks omitted). Moreover, Mrs. Feldman has not met her burden of demonstrating that the jury was not able to make an individualized determination of guilt as to the evidence pertaining to her. *See United States v. Francis*, 131 F.3d 1452, 1459 (11th Cir. 1997) (explaining that, in order to establish prejudice, a defendant must show "that the jury was unable to make an individualized guilt determination for each defendant").

Nevertheless, even if there were any potential prejudice, we have determined that prejudice can be avoided where the district court instructs the jury that it should consider the evidence against each defendant separately. *See Schlei*, 122 F.3d at 984. Here, the district court instructed the jury that:

> [A] separate crime or offense is charged against each defendant in each count of the indictment. Each charge and the evidence pertaining to it should be considered separately. Also, the case of each defendant should be considered separately and individually. The fact that you may find one or any . . . of the defendants guilty or not guilty of any of the offenses charged should not affect your verdict as to any other offense or any other defendant.
>
> I caution you, members of the jury, that you are here to determine from the evidence in this case whether each defendant is guilty or not

10

guilty.  Each defendant is on trial only for the specific offense alleged in each count of the indictment.

We presume that the district court's cautionary instruction prevented any possible prejudice.  *See Francis*, 131 F.3d at 1459 (explaining that "cautionary instructions to the jury to consider the evidence separately are presumed to guard adequately against prejudice." (quotation marks omitted)).  Because Mrs. Feldman has not provided any evidence showing that the jury was not able to make an individualized determination of guilt, she has failed to demonstrate that she suffered compelling prejudice or received an unfair trial.  *See Browne*, 505 F.3d at 1268 ("[Defendant] must discharge the 'heavy burden' of demonstrating 'compelling prejudice' from the joinder." (quotation marks omitted)).  Accordingly, the district court did not abuse its discretion by denying her motion for severance.

## II.    Expert Testimony

Mrs. Feldman's next claim of error is that the district court abused its discretion by denying her motion to exclude Dr. Chaitoff's testimony and by permitting Dr. Chaitoff to extrapolate an opinion as to all 3,200 patient files, based on his review of a small percentage of those files.

We review for abuse of discretion the district court's determinations regarding the admissibility and reliability of expert testimony.  *United States v.*

11

*Frazier*, 387 F.3d 1244, 1258 (11th Cir. 2004).  Federal Rule of Evidence 702

provides that a witness who is qualified as an expert may provide an opinion if:

> (a) the expert's scientific, technical, or other specialized knowledge
> will help the trier of fact to understand the evidence or to determine a
> fact in issue; (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the
> facts of the case.

Fed. R. Evid. 702.  The district court has wide discretion in deciding how to

determine reliability.  *United States v. Abreu*, 406 F.3d 1304, 1307 (11th Cir.

2005).

Prior to trial, Dr. Feldman filed a motion in limine to exclude, or limit, the

testimony of the Government's proposed expert, Dr. Chaitoff.  Following a

*Daubert*[2] hearing, a magistrate judge determined that Dr. Feldman's objection to

Dr. Chaitoff's testimony under Rule 702 was without merit, "at least to the extent

that the opinion does not extrapolate from the reviewed files to a broader

conclusion involving files not reviewed."  The magistrate judge noted that Dr.

Chaitoff's testimony at the hearing resolved any potential issue pertaining to

extrapolation, as he testified that the review of one patient's file would be

insufficient to draw conclusions regarding files that were not reviewed.

---

[2]  *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).

12

Mrs. Feldman now challenges for the first time on appeal an isolated statement made by Dr. Chaitoff at trial. Specifically, while discussing his selection and review of the first 30 patient files, Dr. Chaitoff stated that, "the methodology was random and the conclusions applied to all the patients. So whether I reviewed 30 or I reviewed 3,200, I suspect my conclusions would have been identical." As noted, Mrs. Feldman did not object to this statement.

The Federal Rules of Evidence provide that a defendant need not object to preserve a claim of error on appeal if the district court makes a definitive ruling on a pretrial motion, such as a motion in limine. *See* Fed. R. Evid. 103(b) ("Once the court rules definitively on the record—either before or at trial—a party need not renew an objection or offer of proof to preserve a claim of error for appeal."). That is not what happened here, however. The magistrate judge did not expressly rule on the merits of the extrapolation issue, stating only that the objection to Dr. Chaitoff's testimony pursuant to Rule 702 was without merit "at least to the extent that the opinion does not extrapolate from the reviewed files to a broader conclusion involving files not reviewed." Moreover, it is clear from the order that the magistrate judge believed that any potential extrapolation by Dr. Chaitoff was a non-issue, as he noted that Dr. Chaitoff had specifically testified that his review of one patient's file would be insufficient to draw conclusions as to other patient files that had not been reviewed.

13

Because the magistrate judge did not make a definitive ruling on the extrapolation issue, Mrs. Feldman was required to object to Dr. Chaitoff's statement to avoid plain error review. *See United States v. Wilson*, 788 F.3d 1298, 1313 (11th Cir. 2015) (reviewing defendant's argument for plain error where the district court's pretrial ruling was not definitive); *Cf. United States v. Harris*, 886 F.3d 1120, 1127 n.2 (11th Cir. 2018) (concluding that defendant's argument on appeal was not subject to plain error review—despite the defendant's failure to object at trial—because the district court definitively ruled on the motion in limine). She did not object, so we review her argument for plain error.[3]

Mrs. Feldman cannot prevail under plain error review. Even if she could show an error that was plain, she cannot demonstrate that her substantial rights were violated. Indeed, she cannot show that she was prejudiced—much less substantially prejudiced—by one stray comment made by Dr. Chaitoff concerning his suspicion as to the remaining 3,000+ patient files not reviewed. The comment was made during approximately three days' worth of testimony from Dr. Chaitoff. During that testimony, Dr. Chaitoff focused entirely on the 48 patient files that he reviewed and his opinion as to whether Dr. Feldman's treatment of the specific

---

[3] To show plain error, the defendant must establish that there was "(1) an error (2) that is plain and (3) that has affected the defendant's substantial rights; and if the first three prongs are met, then a court may exercise its discretion to correct the error if (4) the error 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'" *United States v. Madden*, 733 F.3d 1314, 1320 (11th Cir. 2013) (quotation marks omitted).

14

patients in those files was within the ordinary course of professional practice.

Accordingly, Mrs. Feldman is not entitled to relief on this claim.

### III.  Double Jeopardy

Mrs. Feldman asserts that the district court's order declaring a mistrial during the first trial was not supported by manifest necessity, and thus the court should have granted her motion to dismiss the indictment on double jeopardy grounds.  She also argues that the district court failed to comply with Federal Rule of Criminal Procedure 26.3, which requires the court to give the parties an opportunity to object or consent to an order declaring mistrial.

We review the district court's declaration of a mistrial on grounds of manifest necessity to determine whether the court exercised sound discretion in deciding that such a necessity existed.  *United States v. Davis*, 708 F.3d 1216, 1221 (11th Cir. 2013).  And "if the court's decision to declare a mistrial was not based on manifest necessity, it was an abuse of discretion not to dismiss the indictment on double jeopardy grounds." *See id.*

The Double Jeopardy Clause of the Fifth Amendment safeguards a criminal defendant from being subjected to multiple prosecutions for the same offense. U.S. Const. amend. V.  "Ordinarily, when 'a defendant successfully seeks to avoid his trial prior to its conclusion by a motion for mistrial, the Double Jeopardy

Clause is not offended by a second prosecution.'"  *United States v. Shelley*, 405 F.3d 1195, 1200 (11th Cir. 2005) (quotation marks omitted).

"[D]istrict courts are permitted to declare a mistrial and discharge a jury only where, 'taking all the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated.'" *United States v. Therve*, 764 F.3d 1293, 1298 (11th Cir. 2014) (quotation marks omitted).  "Our task is to decide whether the district court exercised 'sound discretion' in declaring a mistrial, and in order to determine that 'we review the entire record in the case without limiting ourselves to the actual findings of the trial court.'" *Davis*, 708 F.3d at 1221 (quotation marks omitted and citation omitted). But "the requirement that manifest necessity be demonstrated operates[] only when the trial court has declared a mistrial without the consent of the defendant." *United States v. Puleo*, 817 F.2d 702, 705 (11th Cir. 1987).  If the defendant consents to a mistrial, the Double Jeopardy Clause will not bar her retrial.  *Id.*

The facts surrounding the declaration of a mistrial during the first trial are as follows.  During the first trial, Mrs. Feldman's attorney asked Dr. Feldman on cross-examination if he had ever been convicted of a felony.  Dr. Feldman stated that he had been convicted of one felony.  Thereafter, the prosecutor asked Dr. Feldman whether the felony he was convicted of related to his practice as a doctor. Dr. Feldman objected and moved for a mistrial, arguing that a curative instruction

16

was not going to cure the prejudice.  Indeed, the defendants were united in their position that a mistrial was necessary.  Mrs. Feldman indicated that she had "the same position as this is a conspiracy case with regard to that I agree that, I agree that I don't believe a curative instruction is going to—."  Following subsequent discussion, the district court recessed for the day.  The next morning, the district court heard argument from the Government and Dr. Feldman as to whether the prejudicial effect of the question could be remedied by a curative instruction.  Ultimately, the district court decided that the defendants were correct in asserting that a mistrial was necessary because the court concluded that it was not possible to cure this issue.  The court thus declared a mistrial.  During this lengthy deliberative process by the court, Mrs. Feldman never indicated any change in her original position that a mistrial was necessary nor did she object when the district court ultimately acquiesced to the defense position that a mistrial was required.

Instead, almost a month later—when the jury was long gone—she filed a motion arguing that the court was wrong to conclude that manifest necessity required a mistrial.  She further argued that she was not provided the opportunity to consent or object to the order declaring a mistrial.  The district court denied the motion.

Mrs. Feldman argues that the Double Jeopardy Clause barred her retrial because a mistrial was not manifestly necessary.  But we need not address manifest

necessity.  Because Mrs. Feldman acquiesced in the court's decision to declare a mistrial, she cannot now be credibly heard to argue that the court's decision was a mistake.

Mrs. Feldman argues that she could not have agreed with the district court's decision to declare a mistrial because the district court failed to provide proper notice before declaring a mistrial.  Federal Rule of Criminal Procedure 26.3 provides that prior to ordering a mistrial, "the court must give each defendant and the government an opportunity to comment on the propriety of the order, to state whether that party consents or objects, and to suggest alternatives."  Fed. R. Crim. P. 26.3.  "[C]ompliance with Rule 26.3 is only one factor to be considered in determining whether a trial judge exercised sound discretion in declaring a mistrial."  *Davis*, 708 F.3d at 1224 (citing *United States v. Berroa*, 374 F.3d 1053, 1058 (11th Cir. 2004)).

We conclude that Mrs. Feldman gave implied consent to the mistrial.  The record in the present case clearly shows that Mrs. Feldman had numerous opportunities to comment or object to the potential declaration of a mistrial, and she never gave even a hint that she objected during the lengthy proceedings concerning this matter.  Indeed, after Dr. Feldman moved for a mistrial, Mrs. Feldman agreed that the prejudice could not be cured by a curative instruction, and then noted that this was a conspiracy case.  When the court reconvened after the

18

overnight recess, Mrs. Feldman raised no objection to the court declaring a mistrial, nor did she object or argue that the court should allow the ongoing trial to proceed against her alone. Even as the jury was departing, she said nothing to the court indicating that a mistrial should not have been declared as to her. *See Puleo*, 817 F.2d at 705 (concluding that defendant consented to mistrial when "even as the jury was departing . . . [counsel] said nothing regarding the mistrial").

In deciding a Double Jeopardy challenge to a second trial, we have recently reconfirmed *Puleo*'s teaching that "a defendant's consent to a mistrial need not be express but may always be implied from the totality of circumstances." *United States v. Isaac Feldman*, 931 F.3d 1245, 1256–57 (11th Cir. 2019) (quotation marks omitted and alterations accepted). As with the present case, we noted in *Isaac Feldman* that, albeit aware that the district court was in the process of declaring a mistrial, the defendant "never voiced any objection to the jury's dismissal . . . . The totality of these circumstances compels the conclusion that [the defendant] impliedly consented to the dismissal of the original jury . . . ." *Id.* at 1257.

So it is here. Mrs. Feldman implicitly consented to the order declaring a mistrial. We therefore conclude that she is entitled to no relief on her claim challenging the district court's denial of her motion to dismiss the indictment on double jeopardy grounds.

19

### IV.    Prosecutorial Misconduct

Mrs. Feldman argues that the prosecutor's closing argument was improper and prejudicial because the prosecutor argued facts not in evidence, put forth a new legal theory of conviction not alleged in the indictment, and interjected her own personal opinion to inflame the jury.

We generally review allegations of prosecutorial misconduct *de novo*. *United States v. Eckhardt*, 466 F.3d 938, 947 (11th Cir. 2006).  Where a defendant fails to object during a prosecutor's closing argument, however, "relief is available to rectify only plain error that is so obvious that failure to correct it would jeopardize the fairness and integrity of the trial."  *United States v. Bailey*, 123 F.3d 1381, 1400 (11th Cir. 1997).

To prevail on a prosecutorial misconduct claim, the defendant must show that the conduct was improper and that it was prejudicial to his substantial rights. *Id.*  A defendant's substantial rights are prejudiced if there is a reasonable probability that, but for the remarks, the outcome of the trial would have been different.  *United States v. Lopez*, 590 F.3d 1238, 1256 (11th Cir. 2009). "Prosecutorial misconduct must be considered in the context of the entire trial, along with any curative instruction."  *Id.*  If the district court provided a curative instruction, "we will reverse only if the evidence is so prejudicial as to be incurable by that measure."  *Id.*

20

Mrs. Feldman raises several challenges to the prosecutor's remarks during closing argument. We conclude that only a few of those challenges warrant any discussion here.[4] First, Mrs. Feldman asserts that the prosecutor improperly commented on facts that were not in evidence when discussing Dr. Feldman's expert, Dr. Adams. Specifically, she takes issue with the prosecutor's statement that when Dr. Adams was employed by the county medical examiner's office, he had found that people who died at home had died of drug overdoses. However, now that he was being paid as a defense expert, he had concluded that one of the victims who died at home—Shannon Wren—died from a heart attack, not a drug overdose. We find nothing improper about the prosecutor's statement, as it was supported by Dr. Adams' testimony that he had previously made findings of drug overdose deaths where people were found dead in their homes.[5]

We next address Mrs. Feldman's assertion that the prosecutor inserted a new theory of conviction not alleged in the indictment by arguing that Mrs. Feldman

---

[4] Mrs. Feldman argues that the prosecutor's following remarks were also improper: (1) a statement that Mayes' sister testified that Dr. Feldman was surprised when she accused Dr. Feldman of prescribing Xanax and methadone to her brother; (2) a statement implying that there were several actions the Department of Health could have taken against Dr. Feldman; and (3) a statement that Mrs. Feldman had spoken with Aimee Martin about ways to stay off the Drug Enforcement Administration's radar. We find no merit to these challenges.

[5] Notably, the district court also provided the following curative instruction when Mrs. Feldman objected to the prosecutor's statement regarding Dr. Adams' testimony: "[t]o the extent the lawyers disagree on what the facts are, members of the jury, you will resolve those disagreements. These are arguments of counsel, they are not evidence."

violated an Internal Revenue Service reporting requirement by failing to disclose foreign bank accounts. When addressing the money laundering convictions in her closing argument, the prosecutor stated that she asked defense expert, Stephen Oscher, if he noticed whether Mrs. Feldman had disclosed to the federal government that she had bank accounts outside of the country. After the district court overruled Mrs. Feldman's objection to this statement, the prosecutor explained that Oscher had said he did not know, he had not seen anything. The prosecutor then stated, "[t]hat's also a requirement, a reporting requirement." In other words, the prosecutor appeared to imply that Mrs. Feldman had violated a reporting requirement by failing to disclose foreign bank accounts. The indictment, however, charged Mrs. Feldman with violating a transaction reporting requirement, not failing to report the existence of a foreign bank account.

Nevertheless, even if we assume that this remark was improper, it does not amount to prosecutorial misconduct because Mrs. Feldman has not met her burden of showing that her substantial rights were violated. In the first place, the district court provided curative instructions. *See Lopez*, 590 F.3d at 1256 (explaining that "we will reverse only if the evidence is so prejudicial as to be incurable by that measure"). The court instructed the jury that their decision must be based on evidence, which "includes the testimony of the witnesses and the exhibits which have been admitted in the record . . . anything the lawyers say is not evidence in

22

the case." The record likewise contained sufficient evidence of guilt independent of the challenged remarks. *Id.* ("When the record contains sufficient independent evidence of guilt, any error is harmless." (citing *Eckhardt*, 466 F.3d at 947)). As discussed *infra*, the Government presented sufficient evidence from which a reasonable jury could conclude that Mrs. Feldman was guilty beyond a reasonable doubt. In short, the challenged comment was a small portion of the 17-day trial in which the Government presented substantial evidence of guilt against Mrs. Feldman.

Finally, we reject Mrs. Feldman's argument that the prosecutor's statement that Wren had a "butt-load" of drugs in his body was unfairly prejudicial. Because Mrs. Feldman failed to object to this statement, our review is limited to plain error. Mrs. Feldman has failed to show error, let alone plain error. *See United States v. Bailey*, 123 F.3d 1381, 1400 (11th Cir. 1997) ("When a defendant fails to object to the prosecutor's closing argument, relief is available to rectify only plain error that is so obvious that failure to correct it would jeopardize the fairness and integrity of the trial."). We have stated that "there is no prohibition on colorful and perhaps flamboyant remarks if they relate to the evidence adduced at trial." *Id.* (quotation marks omitted). We acknowledge that the prosecutor could have described the quantity of drugs in Wren's body in a less graphic manner. However, the truth is that Wren did have a great deal of drugs in his system, and ultimately he died.

23

Thus, the prosecutor's description was consistent with the evidence presented at trial. In short, the remark challenged by Mrs. Feldman does not amount to error, let alone plain error.

As a final matter, Mrs. Feldman asserts that the alleged errors, when viewed individually or cumulatively, prejudiced her substantial rights and deprived her of a fair trial. "The cumulative error doctrine provides that an aggregation of non-reversible errors . . . can yield a denial of the constitutional right to a fair trial, which calls for reversal." *United States v. Capers*, 708 F.3d 1286, 1299 (11th Cir. 2013) (quotation marks omitted). Because Mrs. Feldman has established no error, she cannot prevail under the cumulative error doctrine. *See United States v. Gamory*, 635 F.3d 480, 497 (11th Cir. 2011) ("Where there is no error or only a single error, there can be no cumulative error.").

## V. Jury Instruction

Dr. Feldman argues that the district court abused its discretion by denying his proposed jury instruction on his theory of defense.[6] The specific instruction Dr. Feldman requested was the following:

> It is a physician's duty and obligation to try to relieve a patient's pain. Therefore, it is ethical and medically justifiable for a physician to prescribe controlled substances for a patient suffering from chronic moderate to severe pain, even if the patient has developed a tolerance or addiction to those substances. It is also ethical and medically justifiable for such treatment to be performed for the purpose of

---

[6] Mrs. Feldman adopts this argument.

relieving chronic moderate to severe pain in a patient, regardless of the patient's [addiction] history.

The district court denied the instruction as argumentative, citing this Court's decision in *United States v. Paradies*, 98 F.3d 1266, 1287 (11th Cir. 1996), where we rejected a defendant's proposed jury instruction because it was partisan and sought to have the court parrot the factual findings that the defendant was advocating to the jury.

We review the district court's refusal to give a requested jury instruction for an abuse of discretion. *United States v. Dohan*, 508 F.3d 989, 993 (11th Cir. 2007). The district court's refusal to give a requested instruction is reversible error where the instruction "(1) was correct, (2) was not substantially covered by the charge actually given, and (3) dealt with some point in the trial so important that failure to give the requested instruction seriously impaired the defendant's ability to conduct his defense." *Eckhardt*, 466 F.3d at 947–48.

Here, the district court did not abuse its discretion by refusing to give Dr. Feldman's proposed jury instruction. In the first place, Dr. Feldman has not cited to any legal authority demonstrating that his requested instruction was a correct statement of the law. Although he cites to Florida Statute § 765.1103—a statutory provision governing pain management with respect to palliative care—this statute does not state that it is ethical for a doctor to prescribe controlled substances for chronic pain, regardless of a patient's tolerance or addiction issues. *See* Fla. Stat.

25

§ 765.1103 (providing that "practitioners . . . must, as appropriate, comply with a request for pain management or palliative care from a patient under their care").

Further, Dr. Feldman's proposed jury instruction essentially asked the district court to instruct the jury about the facts Dr. Feldman hoped the jury would find: that it was ethically and medically justifiable for Dr. Feldman to prescribe controlled substances without respect to the patient's medical history or addiction issues. *See United States v. Maxwell*, 579 F.3d 1282, 1304 (11th Cir. 2009) (explaining that the district court is not obliged to present jury instructions that "contain partisan and argumentative statements of law and fact"); *Paradies*, 98 F.3d at 1287 (same). The proposed instruction was plainly argumentative and the court was not required to give a theory-of-defense instruction that "was more in the nature of a jury argument than a charge." *United States v. Barham*, 595 F.2d 231, 245 (5th Cir. 1979). In short, the district court's refusal to give Dr. Feldman's proposed instruction was not an abuse of discretion.

## VI.    Sufficiency of the Evidence as to the Conspiracy Counts

Both Feldmans challenge the sufficiency of the evidence presented to support each of their conspiracy convictions. We review challenges to the sufficiency of the evidence *de novo*, "viewing the evidence in the light most favorable to the government and drawing all reasonable inferences and credibility choices in favor of the jury's verdict." *United States v. Taylor*, 480 F.3d 1025,

26

1026 (11th Cir. 2007). "If a reasonable jury could conclude that the evidence establishes guilt beyond a reasonable doubt, we will affirm the verdict." *Browne*, 505 F.3d at 1253. "Because we recognize that 'the jury is free to choose between or among the reasonable conclusions to be drawn from the evidence presented at trial,' our sufficiency review requires only that a guilty verdict be reasonable, not inevitable, based on the evidence presented at trial." *Id.* (quotation marks omitted).

### A.  Conspiracy to distribute controlled substances without a legitimate medical purpose (Count 1)

Both defendants challenge their conviction for conspiring to distribute or dispense controlled substances without a legitimate medical purpose. To establish a conviction for illegal distribution or dispensation of controlled substances under 21 U.S.C. § 841(a)(1), the Government must prove that the defendant distributed or "dispensed controlled substances for other than legitimate medical purposes in the usual course of professional [medical] practice, and that he did so knowingly and intentionally." *United States v. Azmat*, 805 F.3d 1018, 1035 (11th Cir. 2015) (quotation marks omitted). In order to establish a conspiracy conviction, the Government must show that: (1) "an agreement existed between two or more persons to commit a crime" and (2) "the defendants knowingly and voluntarily joined or participated in the conspiracy." *United States v. Seher*, 562 F.3d 1344, 1364 (11th Cir. 2009) (quotation marks omitted). The existence of an agreement may "be proved by inferences from the conduct of the alleged participants or from

27

circumstantial evidence of a scheme." *Azmat*, 805 F.3d at 1035 (quotation marks omitted). "A conspiracy conviction will be upheld if 'the circumstances surrounding a person's presence at the scene of conspiratorial activity are so obvious that knowledge of its character can fairly be attributed to him.'" *Id.*

Here, the Feldmans do not challenge the jury's finding that Dr. Feldman was dispensing controlled substances outside the usual course of professional practice. Instead, their arguments focus on whether Mrs. Feldman conspired with Dr. Feldman to do so. We conclude that the Government presented ample evidence from which a reasonable jury could conclude that the Feldmans had an agreement to illegally distribute and dispense prescription medications.

The evidence presented at trial showed that Mrs. Feldman was extensively involved in the operation of the clinic. She wore a white doctor's coat, she sat in on office visits, she encouraged new patient referrals, and she managed all of the clinic's money. Because staff members were instructed to copy the sign-in sheets when providing Mrs. Feldman with any cash payments, the jury could infer that Mrs. Feldman was aware of the large number of patients seen at the clinic each day. According to former patient Charlene Riffle, Mrs. Feldman also wrote out prescriptions ordered by Dr. Feldman while he sat at his desk eating fruit.

The Government presented sufficient evidence from which a reasonable jury could infer not only that Mrs. Feldman was aware that Dr. Feldman was

28

prescribing controlled substances outside the usual course of medicine but also that she knowingly participated in his efforts to do so. Mrs. Feldman asked staff members to alert her when law enforcement officers were present in the parking lot and, on those days, she parked in the back of the office. Multiple staff members also testified that Mrs. Feldman directed them to put post-it notes in patient files for anyone whom they believed was an undercover law enforcement officer. She told them that post-it notes were important, so they could be removed easily and not become a permanent item in the file.

When the clinic began discharging too many patients, Mrs. Feldman instructed staff to stop conducting urinalysis screenings. As two experts testified, the urinalysis screenings are instrumental to determining whether a patient is taking the medication as prescribed or diverting it to others. And, on at least one occasion, Aimee Martin, a former patient and friend of the Feldmans, asked Mrs. Feldman if she could fill her prescription early because it had run out. Mrs. Feldman suggested that Martin instead take the medication of her husband—who was also one of Dr. Feldman's patients—thereby encouraging the use of controlled substances outside the usual course of professional practice.

Additionally, Mrs. Feldman told former employee Melinda Detwiler that she and Dr. Feldman had moved their assets into her name and the names of her children, in case anything happened. Finally, as to Dr. Feldman, he testified that

29

he did not have any agreement with Mrs. Feldman to illegally distribute controlled substances, but the jury obviously rejected this testimony.  We may therefore consider his disbelieved testimony as substantive evidence of his guilt.  *See United States v. Woodard*, 459 F.3d 1078, 1087 (11th Cir. 2006) ("[A] defendant's testimony—if disbelieved by the jury—may be considered substantive evidence of guilt.").

Although Mrs. Feldman asserts that there was an innocent explanation for her instruction to staff to stop conducing urinalysis screenings—the test was purportedly too costly—Detwiler testified that the reason Mrs. Feldman instructed staff to stop doing the test was because it was resulting in too many patients being discharged.  Further, Dr. Feldman admitted on cross-examination that the urinalysis screening did not cost the clinic a lot of money, as the screening done in the clinic was included in the cost of the office visit and the patient bore the cost of any urinalysis screening sent to the laboratory.  We are likewise unpersuaded by Mrs. Feldman's argument that she made the comment to Detwiler about shifting her assets because she wanted to have everything in place if Dr. Feldman passed away.  Indeed, Detwiler testified that Mrs. Feldman made the comment during a conversation about clinic patients who were being investigated by law enforcement.  Viewing all of the evidence in the light most favorable to the Government, a reasonable jury could conclude that the Feldmans conspired and

worked together to illegally dispense controlled substances without a legitimate medical purpose.

### B.    Money Laundering (Counts 5 through 8)

The Feldmans also argue that the Government presented insufficient evidence to establish that they conspired to commit money laundering or that they committed any substantive money laundering offenses.

As to the conspiracy charge alleged in Count 5, the Government needed to prove two elements to establish a conspiracy under § 1956(h):  "(1) an agreement between two or more persons to commit a money-laundering offense; and (2) knowing and voluntary participation in that agreement by the defendant." *United States v. Moran*, 778 F.3d 942, 962 (11th Cir. 2015) (quotation marks omitted).  An essential element of money laundering conspiracy is that the defendant "knew that the funds involved in the transactions represented the proceeds of unlawful activity."  *See United States v. Awan*, 966 F.2d 1415, 1434 (11th Cir. 1992).

Relying on their argument that the Government presented insufficient evidence as to the drug conspiracy alleged in Count 1, the Feldmans argue that the evidence presented at trial was insufficient to prove beyond a reasonable doubt that they knew the funds involved in the financial transactions at issue involved criminal proceeds.  However, based on our conclusion that sufficient evidence

31

supported the drug conspiracy conviction, it necessarily follows that the Feldmans knew that the transactions involved the proceeds of unlawful activity.

Dr. Feldman's argument that the Government failed to present sufficient evidence showing that the Feldmans conducted these financial transactions with the intent to conceal the criminal proceeds is also without merit. Concealment was only one of the objects of the conspiracy. Indeed, Count 5 alleged that the Feldmans conspired to conduct a financial transaction with criminal proceeds from the drug conspiracy (1) to promote the carrying on of unlawful activity, (2) to conceal the proceeds, (3) to avoid transaction reporting requirements, and (4) to engage in monetary transactions in property derived from a specified unlawful activity. The jury determined that the Feldmans were guilty of all four objects of the conspiracy. Further, Dr. Feldman does not challenge the jury's finding as to those other three objects, and he has therefore abandoned any challenge he may have had. *See United States v. Jernigan*, 341 F.3d 1273, 1283 n.8 (11th Cir. 2003) (stating that an issue not briefed on appeal is considered abandoned). Because the Feldmans argue only that the Government failed to establish their knowledge of the specified unlawful activity—the drug conspiracy—they are not entitled to relief from their money laundering convictions. *United States v. Ross*, 131 F.3d 970, 984 (11th Cir. 1997) ("A guilty verdict in a multi-object conspiracy will be upheld if the evidence is sufficient to support a conviction of any of the alleged objects.").

32

**VII.  Sufficiency of Evidence as to the Convictions Based on the Dispensation of Controlled Substances Without a Legitimate Medical Purpose that Resulted in Death (Counts 2 through 4)**

In Counts 2 through 4, Dr. Feldman was charged with distribution of controlled substances without a legitimate medical purpose resulting in the deaths of three people:  Joey Mayes (Count 2), Ricky Gonzalez (Count 3), and Shannon Wren (Count 4).  The jury convicted Dr. Feldman on all counts, finding that each victim died as a result of ingesting drugs that Dr. Feldman had prescribed.  On appeal, Dr. Feldman challenges the sufficiency of the evidence showing that Schedule II drugs he prescribed caused each victim's death:  a fact that triggers a 20-year mandatory minimum sentence under the Controlled Substances Act.

To establish a conviction for unlawful dispensation by a physician under 21 U.S.C. § 841(a)(1), the Government must establish that the defendant knowingly and intentionally distributed or dispensed controlled substances other than for a legitimate medical purpose and outside the ordinary course of professional practice.  21 U.S.C. § 841(a)(1); *Azmat*, 805 F.3d at 1035.  There is a penalty-enhancement provision for § 841(a), which provides that a defendant shall be sentenced to a term of not less than 20 years' imprisonment, or more than life, if he dispensed a Schedule I or II drug and death or serious bodily injury "results from the use of such substance."  21 U.S.C. § 841(b)(1)(C).  "Because the 'death results' enhancement increase[s] the minimum and maximum sentences to which

[a defendant is] exposed, it is an element that must be submitted to the jury and found beyond a reasonable doubt." *Burrage v. United States*, 571 U.S. 204, 210 (2014) (citing *Alleyne v. United States*, 570 U.S. 99, 115–16 (2013), and *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000)).

Here, Dr. Feldman's sufficiency-of-the-evidence argument proceeds in two parts. First, he argues that the evidence was insufficient to prove that it was he who prescribed the specific drugs that were ingested by each victim. Second, he argues that the evidence was insufficient to prove that the Schedule II drugs (oxycodone and methadone)—prescribed by him and ingested by the victims— were a but-for cause of each victim's death. We disagree on both fronts and address each issue in turn.

### A.    Drugs Ingested by the Deceased Were Prescribed by Dr. Feldman

Evidence presented at trial fully supported the jury's finding that, as charged in the indictment, the specific drugs ingested by each victim (Mayes, Gonzalez, and Wren) were prescribed by Dr. Feldman.

#### 1.    Ricky Gonzalez

The trial evidence was sufficient to show that Dr. Feldman prescribed the specific drugs ingested by Ricky Gonzalez. On October 5, 2010, only three days before his death, Gonzalez received a prescription from Dr. Feldman for 240 30-milligram pills of oxycodone and 90 10-milligram pills of diazepam (Valium).

34

Gonzalez's girlfriend, Casey Osteen, testified that she saw Gonzalez take oxycodone and diazepam from prescriptions dispensed by Dr. Feldman the night before he died. When she last saw Gonzalez at approximately 11:00 p.m. that night, he appeared "lethargic" and "groggy."

Gonzalez was found dead in his front yard the next day, October 8, 2010. Officers found the bottle of diazepam prescribed by Dr. Feldman in Gonzalez's pants pocket. The bottle contained only 8 of the 90 10-milligram pills of diazepam prescribed by Dr. Feldman, as well as 35 other diazepam pills of varying dosages. The bottle of oxycodone prescribed by Dr. Feldman three days earlier was found empty and smashed near a neighbor's truck. Finally, the toxicology reports confirmed that Gonzalez had oxycodone and diazepam—the same two drugs prescribed by Dr. Feldman—in his system. Based on this evidence, a reasonable jury could infer that the drugs ingested by Gonzalez were prescribed by Dr. Feldman.

### 2.    Joey Mayes

The evidence was also sufficient to demonstrate that Dr. Feldman prescribed the specific drugs Mayes ingested. Mayes first visited Dr. Feldman on March 12, 2010 complaining of back pain. On this visit, Dr. Feldman prescribed Mayes 240 30-milligram tablets of oxycodone, 60 2-milligram tablets of alprazolam (Xanax), and 60 2-milligram tablets of methadone. Less than one week later, on March 18,

35

2010, officers responded to a call from Mayes' residence reporting his sudden death from a possible drug overdose. Mayes' mother testified at trial that she observed Mayes taking the medications prescribed by Dr. Feldman the day before he died. Officers found multiple pill bottles in Mayes' room, including empty pill bottles for the oxycodone and alprazolam prescriptions dispensed by Dr. Feldman on March 12. A subsequent toxicology report revealed that, at the time of death, Mayes had in his system methadone or methadone metabolites, oxycodone, and alprazolam: the same three drugs that Dr. Feldman had prescribed.

Based on this evidence, a reasonable jury could find beyond a reasonable doubt that the controlled substances ingested by Mayes were prescribed by Dr. Feldman. Indeed, the controlled substances found in Mayes' system were the same type of substances prescribed by Dr. Feldman just one week before. In addition, the pill bottles containing those prescriptions were found empty in Mayes' room. *See United States v. Merrill*, 513 F.3d 1293, 1299 (11th Cir. 2008) (concluding that sufficient evidence established that a doctor's recent prescriptions led to the patients' deaths given the short time period between the prescription and the fact that the defendant "prescribed for each of these patients the exact type of drug the medical examiner found to have caused their deaths").

### 3. Shannon Wren

Finally, the evidence was sufficient to prove that Dr. Feldman had prescribed the specific drugs Wren ingested.  Wren was initially seen by Dr. Feldman on May 18, 2011, at which time Dr. Feldman prescribed Wren 120 15-milligram tablets of oxycodone, 60 10-milligram tablets of diazepam, and 60 25-milligram tablets of amitriptyline.

Approximately one week later, on May 26, 2011, Wren was seen vomiting and coughing by his girlfriend as she left for work.  Later that day, Wren was found dead in his master bathroom.  The first officer on the scene found multiple pill bottles in the bathroom.[7]  Included in those medications were the containers of amitriptyline that Dr. Feldman had prescribed on May 18, which contained only 34 pills out of the 60-count prescription.  Subsequently, Wren's father handed over to an investigating agent the bottles of oxycodone and diazepam prescribed by Dr. Feldman, which were empty at that time.

The subsequent autopsy revealed oxycodone, diazepam and its metabolites, and amitriptyline and its metabolites in Wren's system.  During Wren's May 18 visit, Dr. Feldman had prescribed oxycodone, diazepam, and amitriptyline, which

---

[7]  These bottles contained melatonin, gabapentin, fluoxetine, metoprolol, trazodone, anastrozole, injectable testosterone, citalopram, adrenal tea capsule, and amitriptyline.  Of these substances, only amitriptyline was found in Wren's system during the autopsy.  As noted in text, Dr. Feldman had recently prescribed amitriptyline.

were the same drugs found in Wren's system after he died. As with the other two victims, a reasonable jury could conclude that the drugs that Wren ingested were prescribed by Dr. Feldman.

In short, with respect to each victim, a jury could readily find beyond a reasonable doubt that the controlled substances the victim had ingested were prescribed by Dr. Feldman.

> B.    Sufficient Evidence Was Presented at Trial From Which a Jury Could Conclude That But for Ingestion of the Schedule II Drugs Prescribed by Dr. Feldman, the Victims Would Not Have Died

As noted, the Government had sought an enhancement of Dr. Feldman's sentence on these three substantive drug counts. To repeat, the enhancement provision in question imposes a 20-year mandatory minimum sentence and an increased maximum sentence for a defendant who has distributed a Schedule I or II drug when death or serious bodily injury "results from the use of such substance." 21 U.S.C. § 841(b)(1)(C). On appeal, Dr. Feldman argues that there was insufficient evidence to prove that the Schedule II drugs he prescribed caused the victims' deaths.

As to the role played by a Schedule II drug, the jury found in its special verdict that "but for" the Schedule II and Schedule IV drugs prescribed to each victim by Dr. Feldman, death would not have resulted. Dr. Feldman argues, however, that to convict a person based on death resulting from distribution of a

38

Schedule II drug, the Government must prove that the Schedule II drug was the "sole," the "only," or the "independent" cause of each victim's death, and that the Government failed to do so. More particularly, he argues that because each victim also had a non-Schedule II drug in their bodies—which was also prescribed by Dr. Feldman—and because the non-Schedule II drug potentially contributed to the victim's death, the Schedule II drug cannot be said to have caused the particular victim's death.

In arguing that the Government must prove that the Schedule II drug alone caused the death of the victim, Dr. Feldman relies on *Burrage v. United States*, 571 U.S. 204 (2014), which examined the causality requirement of § 841(b)(1)(C) of the Controlled Substances Act. As we explain below, his argument misreads *Burrage*, which neither requires proof that a Schedule I or II drug "alone" caused a victim's death nor precludes application of § 841(b)(1)(C)'s mandatory minimum sentence in mixed-drug intoxication cases. Instead, *Burrage* held only that, "where use of the drug distributed by the defendant is not an independently sufficient cause of the victim's death or serious bodily injury, a defendant cannot be liable under the penalty enhancement provision of 21 U.S.C. § 841(b)(1)(C) unless such use is a but-for cause of the death or injury." *Id.* at 218–19 (emphasis added). Applying that standard, we find that sufficient evidence of but-for causation was presented at trial.

39

1.    *Burrage*

In *Burrage*, the victim had died after ingesting alprazolam, clonazepam, oxycodone, hydrocodone, and heroin. 571 U.S. at 207. The defendant had provided the victim only with the heroin, which is a Schedule I drug, and he was tried based on that distribution, as well as on the enhancement penalty triggered by § 841(b)(1)(C) when death results from distribution of a Schedule I or II drug. *Id.* at 206–07. Neither expert witness could say whether the victim would have lived had he not taken the heroin; in other words, he might have died even without the heroin, given the other drugs he had taken. *Id.* at 207. This failure of proof meant that the Government had not proved that but for the heroin, the victim would have lived. *Id.* Nevertheless, the district court concluded that the Government was not required to prove that the heroin was a "but-for" cause of the victim's death, and it instructed the jury that it could find that death resulted from the defendant's heroin distribution if it merely found that the heroin was a "contributing cause" of the victim's death. *Id.* at 207–08.

The Supreme Court disagreed with the causation standard adopted by the district court. Because § 841(b)(1)(C) does not define the phrase "results from," the Court applied its ordinary meaning, concluding that the phrase imposed the "traditional" requirement of "actual causality." *Id.* at 210–11. Proving "actual causality," the Court explained, generally requires proof that, at a minimum, "the

40

harm would not have occurred in the absence of—that is, but for—the defendant's conduct." *Id.* at 211 (quotation marks omitted). In other words, a factor can be considered an "actual cause" if it was necessary for bringing about that result—that is, if the result would not have occurred without (or "but for") the influence of the factor.

To illustrate how this but-for notion of "actual causation" applies, the Court used three hypotheticals. *Id.* at 211–12. In the first hypothetical, "A shoots B, who is hit and dies." *Id.* at 211. In this case, only one factor is in play—A's conduct in shooting B. The Court explained that, in this example, A actually caused B's death because B would not have died "but for" A's conduct. *Id.* In other words, A's conduct was necessary for producing B's death: had A not shot B, B would have lived.

The Court made clear, though, that but-for causality does not require that a single factor alone produce the particular result. As the Court explained, "[t]he same conclusion follows <u>if the predicate act combines with other factors to produce the result, so long as the other factors alone would not have done so</u>—<u>if</u>, so to speak, <u>it was the straw that broke the camel's back</u>." *Id.* (emphasis added). To illustrate how a factor can be a but-for cause (that is, a necessary factor for producing a result) even when other factors are themselves but-for causes, the Court posed a second hypothetical.

41

In this hypothetical, a "man debilitated by multiple diseases" ingests poison and dies. *Id.* Here, the Court explained, the poison "is a but-for cause of his death even if those diseases played a part in his demise, so long as, without the incremental effect of the poison, he would have lived." *Id.* Thus, both the poison and the debilitating diseases are but-for causes of the death if each factor played a *necessary* role in producing that outcome. Further, the poison and the debilitating diseases would each constitute a but-for cause of the man's death—"the straw that broke the camel's back"—if the man would have lived had he (1) only had debilitating diseases, but not taken the poison or (2) only taken the poison, but not had debilitating diseases. In other words, had one of these factors been absent, the decedent would not have died. If, however, a debilitating disease was "independently sufficient"—that is, enough by itself—to kill the man at the same time that he was ingesting the poison, the "incremental effect" of the poison was not necessary to produce the resulting death. *Id.* at 211, 218–19. In that case, the poison would not be considered a but-for cause of the man dying; it was not "so to speak, [] the straw that broke the camel's back," because the debilitating disease had performed that function.[8] *Id.* at 211.

---

[8] The Supreme Court considered, but did not decide, the question of causation when a victim dies following two concurrent events, each of which would have been enough on its own to cause death. The Court posited a scenario in which "A stabs B, inflicting a fatal wound; while at the same moment X, acting independently, shoots B in the head also inflicting a fatal wound; and B dies from the combined effects of the two wounds." *Burrage*, 571 U.S. at 215 (alterations

The Court further elaborated on the but-for-causation principle in a third hypothetical, asking the reader to consider a baseball game where the visiting team's leadoff batter hits a home run in the first inning and the visiting team ultimately wins 1 to 0. *Id*. at 211–12. The Court noted that one could accurately say that the home run actually caused the victory because the visiting team would not have won but for the home run—that is, the home run was necessary for the 1-0 victory to occur. *Id.* The Court explained that the home run was no less a but-for cause of the victory just because it was only one of many but-for causes that were each necessary for the visiting team to win. *Id.* at 212. As the Court put it, "[i]t is beside the point that the victory also resulted from a host of *other* necessary causes, such as skillful pitching, the coach's decision to put the leadoff batter in the lineup, and the league's decision to schedule the game." *Id.* (emphasis in original). This is so because whether a factor is a but-for cause turns only on whether the

_____

accepted) (citation omitted). In other words, B would have died had he only been stabbed. Likewise, he would have died had he only been shot. Each was an independent sufficient cause of his death.

Quoting from the noted criminal law treatise, *LaFave, Substantive Criminal Law* at 468, the Supreme Court noted that the treatise recognizes a special rule for such scenarios providing that "A will generally be liable for homicide even though his conduct was not a but-for cause of B's death (since B would have died from X's actions in any event)." *Id.* The Court acknowledged, however, that: "We need not accept or reject the special rule developed for [the above scenario], since there was no evidence here that [the decedent's] heroin use was an independently sufficient cause of his death. No expert was prepared to say that [the decedent] would have died from the heroin use alone." *Id*.

43

result would have occurred without it; that is, whether that individual factor made a difference to the outcome.

"By contrast," the Court says, "it makes little sense to say that an event resulted from or was the outcome of some earlier action if the action merely played a nonessential contributing role in producing the event." *Id.* Thus, the Court explains, if we modify the baseball hypothetical such that the visiting team's leadoff batter hits a home run in the first inning, but the visiting team ultimately wins by 5 to 2 rather than 1 to 0, the home run was not a but-for cause of the victory. *Id.* This is so because the visiting team would have won even without the home run:  the visiting team had a total of 5 runs and only needed 3 to win, meaning that the other runs that the visiting team scored were collectively sufficient on their own to cause the victory without needing the incremental effect of the leadoff hitter's home run. In this scenario, the leadoff home run played a nonessential role in producing the outcome.  It did not "[break] the camel's back." *Id.* at 211.

2.    Application of *Burrage* to Multi-Drug-Usage Scenarios

In order to determine when one can properly conclude that death has resulted from the ingestion of a Schedule I or II drug, which event triggers § 841(b)(1)(C)'s sentence enhancement, we move away from our national pastime

44

to examine how *Burrage* applies to various multi-drug use scenarios involving the ingestion of a Schedule I or II drug together with non-Schedule I or II drugs.

First, we posit a deceased who ingested heroin, a Schedule I drug, in an amount large enough to constitute a fatal dose for this person had the heroin been taken alone.  In this hypothetical, we further assume that the decedent had also taken Valium, a Schedule IV drug,[9] but that the Valium, by itself, would not have caused death.  Figuring out causation here is simple.  Because the drug user has died from this fatal dose of heroin, we can readily say that the heroin was a but-for cause of his death.  In other words, because the decedent would have lived had he not ingested the heroin, use of the heroin was necessary for producing the death.

Indeed, if the prosecution proved that the drug user took a fatal dose of heroin that by itself would have been enough to produce death, this evidence satisfies a higher standard for proving actual causation than even *Burrage*'s but-for test requires.  In this situation, the heroin was not only a necessary, but-for cause of the death, but it was also independently sufficient, by itself, to cause the user's death, even without the influence of any other factors, including the Valium.

Second, we change the facts a bit to assume that the deceased not only ingested enough heroin that by itself would be fatal, but he also took enough

---

[9]  Valium, whose generic version is called diazepam, is a Schedule IV drug that does not give rise to an enhancement if death results.

45

Valium that, had the Valium been taken alone, it would likewise have caused death. In other words, each of the two drugs independently would have caused death. Although the Supreme Court expressly declined to reach this particular scenario,[10] there is a strong argument that the heroin should be considered to have caused the death for purposes of the sentencing enhancement. If actual causation can be established by proving a factor was necessary to cause a result (meaning it satisfies the but-for test), it logically follows that actual causation can also be established by satisfying a higher standard for proving that the factor was sufficient, by itself, to cause the result. It would create an extremely odd result if the purveyor of a Schedule I or II drug that was strong enough by itself to cause death could escape liability merely because the victim also happened to have taken a non-Schedule I or II drug that was itself independently sufficient to cause death. And the Supreme Court in *Burrage* indicated that it did not require satisfaction of the but-for test when the drug at issue is an independently sufficient cause of the victim's death. *Burrage*, 571 U.S. at 218–19.

Our third hypothetical takes us into a scenario in which the heroin is not a but-for cause. In this hypothetical, where again the deceased has taken both heroin and Valium, we assume that the heroin was not enough, by itself, to induce death, but that the Valium dosage was strong enough to have caused the decedent to die,

---

[10] See discussion at n.8, *supra*.

46

even had he not ingested any heroin.  In this scenario, use of the heroin does not

meet the but-for test because it had no impact on what ultimately happened to the

drug user.  He would have died—whether or not he had used heroin—because the

Schedule IV Valium was going to kill him anyway.

In our fourth and final hypothetical, we assume the heroin would not have

caused the deceased's death had it been taken alone, but likewise the deceased

would not have died had he taken just the Valium.  Yet, by virtue of the fact that he

ingested the heroin along with the Valium, he died.  Here, the heroin can be

considered the straw that broke the camel's back.  Stated another way, had the

victim never ingested the heroin, the decedent would still be alive.  We conclude

that, consistent with *Burrage*, the but-for test for the heroin is met in this scenario.

Dr. Feldman, however, disagrees with our analysis, at least as to this fourth

scenario.  In the present case, the evidence established that each victim had

ingested two types of drugs prescribed by the doctor:  Schedule II drugs

(methadone and oxycodone for one victim and oxycodone for the other two

victims) and a non-Schedule II drug (Xanax as to one victim and Valium as to the

other two victims).  Further, the evidence supported an inference either that the

Schedule II drugs were independently sufficient to cause each victim's death or, at

the very least, that neither of the non-Schedule II drugs would have caused death

had the decedent not ingested the Schedule II drug(s).  Thus, the evidence clearly

established that, had each respective victim not used the Schedule II drug in question, he would not have died. In other words, but for the Schedule II drugs, the victims would still be alive.

It is Dr. Feldman's position, though, that causation cannot be established unless the Schedule II drug was the sole or only cause of death. According to the doctor, if the non-Schedule II drugs (that he had also prescribed together with the Schedule II drugs) played any role in causing the victim's death, it can no longer be said that use of the Schedule II drugs resulted in death, even though the Schedule II drugs have met the but-for test. That certainly sounds like an odd conclusion. And it is. *Burrage* does not require proof that a Schedule I or II drug be the "only" cause of a victim's death. Indeed, the Court explicitly rejected that characterization of but-for causation, stating that a factor can be a but-for cause even if it "combines with other factors to produce the result," and that whether "a host of *other* necessary causes" might also contribute to the result is "beside the point." *Id.* at 211–12 (emphasis in original). Moreover, a rule requiring proof that a drug is the one-and-only but-for cause would be tantamount to requiring a showing that the drug was "independently sufficient" to cause the death—a bar that is much higher that the "*minimum*" showing of but-for causation that *Burrage* required. *Id.* at 211 (emphasis in original). Notably, *Burrage* expressly held that the Government need not prove that a Schedule I or II drug was "an independently

48

sufficient cause of the victim's death or serious bodily injury," stating that only but-for causation is required, and implying that we can dispense with the but-for test when a drug is an independently sufficient cause of death. *Id.* at 218–19.

Likewise, Dr. Feldman's argument that evidence of "mixed-drug intoxication" necessarily precludes a finding that a victim died as a result of a Schedule I or II drug finds no support in *Burrage*. In *Burrage*, the medical experts testified that the victim had died from "mixed drug intoxication with heroin, oxycodone, alprazolam, and clonazepam all playing a contributing role." *Id.* at 207 (quotation marks omitted). Neither expert could say, however, "whether [the victim] would have lived had he not taken the heroin." *Id.* In concluding that insufficient evidence supported the defendant's conviction, the Court held that proving actual causation required more than showing that a Schedule I or II drug "contributes to an aggregate force (such as mixed-drug intoxication) that is itself a but-for cause of death." *Id.* at 214. But this statement in no way suggests that a defendant is off the hook anytime a Schedule I or II drug that he distributed ends up in a deadly drug cocktail that kills a victim. Instead, the Court's statement was intended to clarify that the Government could not establish that a Schedule I or II drug actually caused a death without evidence that the Schedule I or II drug itself—as opposed to the drug cocktail as a whole—made a difference to the outcome. *Id.* at 214, 219 (concluding that the lack of "evidence that [the victim]

49

would have lived but for his heroin use" required reversal of the defendant's conviction). In other words, to prove but-for causation, the Government must drill down and show that, but for the Schedule I or II drug's inclusion in the drug cocktail, the victim would have lived. If the Government makes that showing, it is "beside the point" that other drugs were necessary to make the drug cocktail deadly. *See id.* at 211–12, 218–19.

Indeed, a sister circuit, the Sixth Circuit, has reached the same conclusion. In *United States v. Volkman*, 797 F.3d 377, 396 (6th Cir. 2015), the defendant doctor had been convicted of the enhancement provision based on his dispensing of the Schedule II drug oxycodone to the victim. He argued that because the decedent died based on the "combined effects of oxycodone, diazepam, and alprazolam," the Government had failed to prove that the death resulted from the ingestion of oxycodone. *Id.* at 395. Relying on *Burrage*, the Sixth Circuit panel rejected this argument, holding that "[t]he Government was not required to prove, however, that oxycodone was [the victim's] *only* cause of death" because "but-for causation exists where a particular controlled substance—here, oxycodone—'combines with other factors'—here, *inter alia*, diazepam and alprazolam—to result in death," and "[t]he Government presented sufficient oxycodone-specific evidence for a rational jury to find that, 'without the incremental effect' of the oxycodone, [the victim] would not have died." *Id.* So it is here. As *Volkman*

50

explained, "the existence of other potential contributing causes of death is irrelevant so long as the Government presented sufficient evidence that [the Schedule II controlled substance] was a but-for cause of [the victim's] death." *Id.* at 395–96; *see also Roundtree v. United States*, 885 F.3d 1095, 1098 (8th Cir. 2018) (concluding that where an expert testified that heroin and alcohol had worked together "synergistically" to cause death and where alcohol was not enough by itself to cause death, no reasonable jury could find that the heroin was merely a contributory factor, as opposed to a but-for cause).

With these principles in mind, we conclude that the Government presented sufficient evidence for each of Counts 2–4 to prove beyond a reasonable doubt that a Schedule II drug that Dr. Feldman prescribed (methadone or oxycodone) was, at a minimum, a but-for cause of each victim's death.

### 3.     Ricky Gonzalez

The evidence presented at trial was sufficient to support a conclusion that a Schedule II drug—oxycodone—was a but-for cause of Gonzalez's death.  First, evidence provided by the defense expert, Dr. Adams, indicated that there was enough oxycodone in Gonzalez's system to kill a person who did not have a high degree of tolerance.  In other words, use of oxycodone was a potentially sufficient cause, by itself, to cause death.

51

But whether or not oxycodone was a sufficient cause, there was ample evidence from which a jury could conclude that but for Gonzalez's use of oxycodone, he would not have died.  Dr. Thogmartin, the medical examiner who performed Gonzalez's autopsy, observed that Gonzalez had pulmonary edema, or fluid-filled lungs, an occurrence often seen in drug overdoses.  Dr. Thogmartin concluded that Gonzalez's cause of death was oxycodone toxicity with a contributory condition of diazepam (Valium) intoxication.[11]

Noting that Gonzalez had a significant amount of oxycodone and diazepam in his system, the doctor explained that the oxycodone, a Schedule II drug, had "poisoned" Gonzalez and the diazepam, a Schedule IV drug, had reacted "synergistically" to speed up his death.  He explained that in an overdose scenario involving the mixture of an opiate, such as oxycodone, and a benzodiazepine, such as diazepam, the "main player" in causing death is the opiate, with the benzodiazepine acting as only a "minor leaguer," a "contributory cause."  As to how he would characterize such an interaction, he determined that the oxycodone was "the big player" and therefore the "cause of death," and that the diazepam "was not lethal in and of itself, but a helper."  Indeed, in explaining that "oxycodone is the big player," the doctor doubted that diazepam alone would have

---

[11]  Again, the jury concluded that Dr. Feldman had prescribed both the oxycodone and diazepam found in Gonzalez's system.

killed Gonzalez," noting that "[d]iazepam is really hard to overdose on. . . . I mean, you'd have to like eat a ton and even then you may not die."  While he thought there was enough oxycodone here to kill Gonzalez by itself, he couldn't say for certain that Gonzalez would have died had he not also ingested the diazepam, as that is the typical scenario he has observed.  Nevertheless, Dr. Thogmartin concluded, with a reasonable degree of medical certainty, that if it were not for the oxycodone he ingested, Gonzalez would "not have died this day of this death."  In short, the doctor concluded that Gonzalez died of oxycodone intoxication, with death having been sped up by the concurrent ingestion of the diazepam.

In short, at the least, a jury could reasonably conclude that the oxycodone was a necessary, but-for cause of his death.  In other words, Gonzalez would have remained alive had he not ingested this Schedule II drug.  Even assuming that the diazepam may have also constituted a necessary, but-for cause of death, that fact does not deprive the oxycodone of its own "but-for" status.  To argue that it does is to conclude that the oxycodone had to be a sufficient cause of death:  that is, that the drug had to, by itself, be capable of causing death.  As explained above, this is not how *Burrage* defined a but-for cause and indeed *Burrage* made clear that there can be multiple but-for causes of an event.  Accordingly, a reasonable jury could conclude beyond a reasonable doubt that Gonzalez died as a result of a Schedule II drug that Dr. Feldman prescribed:  namely, oxycodone.

4.    Joey Mayes

The toxicology report indicated that Mayes had ingested two Schedule II drugs—methadone and oxycodone—and one Schedule IV drug—alprazolam (Xanax). Dr. Feldman had prescribed all three drugs. There was testimony from both the Government's expert, who was the medical examiner who performed the autopsy, and from the defense expert that there was enough methadone in Mayes' system to kill him, even had other drugs not been ingested.

As for the defense expert, Dr. Adams testified that Mayes' cause of death was "intoxication by methadone," which was "the only drug on board capable of causing a cardiac death." From that testimony, alone, a jury could have found, at a minimum, that methadone played a necessary (but-for) role in Mayes' death, without which he would have lived. Moreover, because Dr. Adams' testimony exculpated the Schedule IV alprazolam, as well as the Schedule II oxycodone, a jury would have been entitled to find that methadone was also an "independently sufficient cause" of Mayes' death. *Burrage*, 571 U.S. at 218–19.

As for the Government's expert, in his autopsy report, Dr. Wilson had listed the cause of death as multidrug toxicity involving the above-listed drugs. He did not stop there, however. Dr. Wilson further testified that Mayes had "particularly elevated" levels of methadone in his system in an amount that was enough by itself to kill him, and he made clear that the methadone was the critical drug necessary to

have caused Mayes' death.  Further, given the high level of methadone, Mayes would have died even had he received quicker medical attention.  In addition to the methadone, Dr. Wilson also stated that there was likely enough oxycodone (a Schedule II drug), by itself, to kill Mayes.

And while the doctor acknowledged that his autopsy report had used the phrase "multidrug toxicity," explaining that in his opinion each drug "had a role" in killing Mayes, acting "synergistically" with one another, he reiterated that the methadone was "the major drug that was involved in Mr. Mayes' death, with distributing effects from alprazolam as well as oxycodone."

Based on this testimony, a reasonable jury could conclude that each of the Schedule II drugs (methadone and oxycodone) played, at a minimum, a necessary "but-for" role in causing Mayes' death.  As discussed above, that another drug (the alprazolam) may have also played a necessary role in causing Mayes' death is "beside the point."  *Id*. at 211–12.

### 5.    Shannon Wren

As to Shannon Wren,  defense expert Dr. Adams opined that the cause of death for this decedent was a heart attack, not the drugs ingested by Wren.  The medical examiner, Dr. Wilson, disagreed.  Instead, Dr. Wilson concluded that Wren died from multidrug toxicity.  He testified that the oxycodone in Wren's system would have been enough, by itself, to kill him, and that the diazepam would

not have been sufficient to kill Wren, by itself.  As to listing the ultimate cause of death as multidrug toxicity, he explained that each of the drugs acted with the others to cause death.[12]

In short, taking the evidence in the light most favorable to the Government, this evidence was sufficient to support an inference that the oxycodone was a sufficient cause of Wren's death, as well as a necessary, "but-for" cause.

Dr. Feldman points out that his expert, Dr. Adams, disagreed with Dr. Wilson's conclusion that Wren died from multidrug toxicity.  Instead, Dr. Adams believed that Wren's enlarged heart and the fact that he was found dead on the bathroom floor indicated that he had died from sudden cardiac arrest, rather than from a drug overdose.  Dr. Adams did not perform the autopsy, however; Dr. Wilson did.  Further, Dr. Wilson considered Wren's enlarged heart and nevertheless concluded that there was no evidence of heart attack because there was "still enough . . . reservoir opening of the coronary arteries to give enough blood to the heart."  It was within the province of the jury to choose among the reasonable constructions of the evidence and weigh Dr. Wilson's testimony more heavily than Dr. Adams'.  *See United States v. Ndiaye*, 434 F.3d 1270, 1294 (11th

---

[12]  The drugs found in Wren's system included oxycodone, diazepam, amitriptyline, and metabolites of the latter two drugs.  Like diazepam, amitriptyline (more familiarly known as the antidepressant Elavil) is a Schedule IV drug.  The defense expert indicated that this Elavil was in "an innocuous concentration," and the Government's expert did not focus on it at all.  Nor was this drug listed on the special verdict form.

Cir. 2006) ("Because the jury is free to choose among reasonable constructions of the evidence, the evidence may be sufficient even if it is not entirely inconsistent with conclusions other than guilt.").

In sum, when viewed in the light most favorable to the Government, there was sufficient evidence from which a reasonable jury could conclude that a Schedule II drug prescribed by Dr. Feldman—methadone and oxycodone in Mayes' case, and oxycodone in Gonzalez's and Wren's cases—was, at the very least, a but-for cause of each of the victims' deaths, if not an independently sufficient cause.

## VIII.  Alleged *Alleyne* Error

Dr. Feldman asserts that even if there was sufficient evidence to support the sentencing enhancement for Counts 2–4, its application in this case was unconstitutional under *Alleyne v. United States*, 570 U.S. 99 (2013).  The Government does not dispute that Dr. Feldman adequately preserved this issue below, and we therefore review his claims of *Alleyne* error *de novo*.  *United States v. King*, 751 F.3d 1268, 1278–79 (11th Cir. 2014).

As noted above, in Counts 2–4, Dr. Feldman was convicted of violating 21 U.S.C. § 841(a)(1) based on his unlawful dispensing of oxycodone (a Schedule II drug), methadone (a Schedule II drug), alprazolam (a Schedule IV drug), and diazepam (a Schedule IV drug) to the three individuals identified in those counts.

The jury rendered that verdict by answering in the affirmative the special verdict form's[13] first two questions for each count, finding that Dr. Feldman was guilty of distributing and dispensing the Schedule II and Schedule IV drugs identified in the indictment.  Although Dr. Feldman challenged the sufficiency of the evidence supporting his conviction for conspiracy to distribute these substances and argued that insufficient evidence supported a jury finding that the Schedule II drugs resulted in death, he has not challenged his substantive distribution convictions. And even had he done so, we would have rejected that challenge.  There is ample evidence to support the jury's conclusion that Dr. Feldman prescribed all of these substances to the particular victims and that he did so not for a legitimate medical purpose and not in the usual course of professional practice.

The maximum penalty for an "unenhanced" conviction based on distribution of a Schedule II drug is 20 years' imprisonment.  21 U.S.C. § 841(b)(1)(C).  Thus, without any other enhancements, Dr. Feldman was subject to a 20-year maximum sentence, with no mandatory-minimum provision, for each conviction set out in Counts 2–4.

The Government, however, sought an enhanced sentence, alleging that each of the victims identified for purposes of Counts 2–4 had died as a result of their

---

[13]  The special verdict form for each victim included four overarching questions, with two of the questions including sub-parts that asked the jury to make findings regarding each specified controlled substance.

ingestion of the Schedule II drugs prescribed by Dr. Feldman.  Under the Controlled Substances Act's sentence-enhancement provision, if death results from the use of a Schedule II substance, the person convicted of distributing that drug is subject to a mandatory-minimum 20-year sentence, with a statutory maximum of life imprisonment.  *Id.* § 841(b)(1)(C).  Death resulting from ingestion of a Schedule IV substance, however, results in no enhancement.

The district court determined that the jury had convicted Dr. Feldman of conduct justifying the above enhancement.  As a result, Dr. Feldman was subject to a mandatory-minimum 20-year sentence, and the district court ultimately decided that a 300-month sentence (25-years) was a reasonable sentence based on the conduct underlying these three convictions.[14]

"Because the 'death results' enhancement increase[s] the minimum and maximum sentences to which [a defendant is] exposed, it is an element that must be submitted to the jury and found beyond a reasonable doubt."  *Burrage*, 571 U.S. at 210 (citing *Alleyne*, 570 U.S. at 115–16, and *Apprendi*, 530 U.S. at 490).  Dr. Feldman asserts that the jury did not convict him of distributing a Schedule II substance from which death has resulted, which, if correct, would mean that the

---

[14]  Dr. Feldman received a 10-year sentence for his convictions for conspiracy to distribute controlled substances and conspiracy to commit money laundering, a 10-year sentence for his substantive money laundering convictions, and a 25-year sentence for the enhanced distribution of a Schedule II substance, use of which had resulted in death.  All sentences ran concurrently with each other.

59

district court violated *Alleyne* when it sentenced Dr. Feldman as if the jury had so found. Specifically, and relying again on *Burrage*, Dr. Feldman argues that the jury's special verdict established only a finding that a combination of Schedule II and Schedule IV drugs in the aggregate killed each victim, not that the victims would have lived "but for" their use of the Schedule II drugs. Accordingly, Dr. Feldman contends that the jury verdict was insufficient to trigger a 20-year mandatory minimum sentence enhancement or a statutory maximum exceeding twenty years.

To the extent that Dr. Feldman's *Alleyne* argument mirrors his sufficiency-of-the-evidence argument, we reject it as a misreading of *Burrage*. As discussed above, *Burrage* did not hold that a Schedule I or II drug must be the "only" cause of a victim's death. Indeed, *Burrage* reached the opposite conclusion, explaining that a factor can be a but-for cause even if it "combines with other factors to produce the result, so long as the other factors alone would not have" produced the same result. *Id.* at 211. Under *Burrage*, but-for causality simply turns on whether the victim would have died "without the incremental effect" of a Schedule I or II drug. *Id.* In other words, a Schedule I or II drug is a but-for cause of a victim's death if it made a necessary contribution to the death—"if, so to speak, it was the straw that broke the camel's back"—such that the victim would have lived if he had not taken the Schedule I or II drug. *Id.* The existence of other necessary

60

causes, such as other drugs in a deadly cocktail, is "beside the point." *Id.* at 212.

For a sentencing court to impose an enhanced sentence under § 841(b)(1)(C), a

jury need only find that a Schedule I or II drug was a but-for cause of death or

serious bodily injury. *Id.* at 210–11, 218–19.

As discussed at length above, we conclude that the evidence was sufficient

to prove beyond a reasonable doubt that but for ingestion of the Schedule II drugs

dispensed by Dr. Feldman, the victims would not have died.  Nevertheless, we

agree with Dr. Feldman that the special verdict in this case failed to establish that

the jury <u>actually found</u> that the Schedule II drugs were but-for causes of the

victims' deaths.  Accordingly, we conclude that the district court erred under

*Alleyne* by imposing an enhanced sentence under § 841(b)(1)(C).  We explain our

reasons for reaching this result.

The third and fourth questions on the verdict form for each of Counts 2, 3,

and 4 focused on the deaths of Mayes, Gonzalez, and Wren, respectively.

Aggregating all the drugs dispensed by Dr. Feldman to the victim—both Schedule

II and Schedule IV—the third question asked whether the jury found that the

victim would not have died but for his use of the listed drugs.[15]  The question for

---

[15]  Asking for a "yes" or "no" answer, the question read:  "We, the jury, find beyond a
reasonable doubt that the death of [the victim] resulted from the use of one or more of the
following controlled substances:  [identifying Schedule II and Schedule IV controlled substances
dispensed to victim], that is, but for his ingestion of the controlled substances charged, he would
not have died."

61

Count 2 (Mayes) listed as the relevant drugs oxycodone and methadone, which are Schedule II drugs, as well as alprazolam, which is a Schedule IV drug. The questions for Counts 3 and 4 (Gonzalez and Wren) each listed as the relevant drugs oxycodone, a Schedule II drug, and diazepam, a Schedule IV drug. For each count, the jury responded "Yes," finding that the victim would not have died but for his use of the listed controlled substances.

These findings clearly do not support the district court's application of § 841(b)(1)(C)'s mandatory-minimum sentence. This is so because, at most, the jury's "Yes" responses to these questions represented a finding only that the Schedule II and Schedule IV drugs in the aggregate caused the deaths. And *Burrage* held that it is insufficient merely to show that a Schedule I or II drug was part of a mixed-drug cocktail, which, as "an aggregate force," was "itself a but-for cause of death." *Id.* at 214. Instead, *Burrage* requires a jury finding that a Schedule I or II drug was itself a but-for cause of the victim's death—that is, without the specific incremental effect of the Schedule I or II drug, the victim would have lived. *See id.* at 207, 211, 218–19 (reversing the defendant's conviction where the evidence showed only that the victim died as a result of a cocktail of drugs, including heroin, oxycodone, alprazolam, and clonazepam, and the Government conceded that no evidence showed the victim would have lived but for his heroin use).

The fourth question on Dr. Feldman's special verdict form purportedly attempted to disaggregate the drugs to seek a finding as to which specific drugs caused the death. Considering all the circumstances, however, we conclude that this question failed to elicit the jury's finding on what was the relevant question: whether the Schedule II drugs were but-for causes of the victims' deaths. Specifically, this final question for each of Counts 2–4 asked whether the jury found "beyond a reasonable doubt that the death of [the victim] resulted from the use of the following," then it listed separately each specific drug dispensed to the victim: both Schedule II and Schedule IV substances. (emphasis added). The jury answered "Yes" for each drug listed. In contrast with the prior question, though, this fourth question entirely omitted any mention of but-for causation and failed to make clear to the jury that absent a finding that the victim would not have died had he not used a particular drug, the jury could not conclude that the victim's death resulted from that drug.

We cannot conclude based on the jury's response to this final question that it found beyond a reasonable doubt that a Schedule II drug Dr. Feldman prescribed—oxycodone and methadone for Count 2, and oxycodone for each of Counts 3 and 4—was a but-for cause of the victims' deaths. First, the verdict form's failure to spell out what "resulted from" meant in the critical and final question raises a significant concern that the jury was unaware of that phrase's meaning as it

pertains to whether death resulted from a specific drug.  And because the first "results in" question explained that "resulted from" meant that the victim would not have died but for ingestion of the drugs in the aggregate, but the second question omitted an explanation of what "resulted from" meant, the jury could have concluded that it was once again being asked to find whether all the drugs resulted in each victim's death, rather than whether each victim would have lived but for his ingestion of a Schedule II drug in particular.

Even with the omission of the "but-for" language in this pivotal, final question, we might well reach a different result had the district court's instructions explained to the jury that, in order to conclude that death had resulted from a particular Schedule II drug, it must find that but for ingestion of that drug, death would not have occurred.  Unfortunately, the court's instructions did not do so. The court instructed the jury only that it "must find beyond a reasonable doubt that but for the decedent's use of the charged controlled substance**s** distributed . . . the decedent would not have died." (emphasis added).  This plural reference to controlled substance**s** in the instructions necessarily included the Schedule IV substances, which of course cannot trigger an enhancement.  And it replicates the first interrogatory on the special verdict form, which directed the jury to make a finding only as to whether the drugs in the aggregate caused each victim's death.

64

Thus, the court's instructions failed to make clear that the jury needed to make a specific finding as to whether the victim would have lived but for his use of the Schedule II controlled substance.  Indeed, the instructions never indicated that the Schedule II drugs had any special significance in the case, as the court merely instructed the jury that "a more serious offense is committed" whenever "death or serious injury is a consequence of the decedent's use of **a** controlled substance." (emphasis added).  Nor did the prosecutor or defense attorney point out in closing arguments the specific determination that the jury was being called on to make.

Given this context, we cannot conclude that the jury found beyond a reasonable doubt that the victims would have lived but for their ingestion of the Schedule II drugs.  Admittedly, the jury's finding that the victims' deaths "resulted from" each of the Schedule II and Schedule IV drugs is not inconsistent with a finding that the Schedule II drugs were but-for causes of the deaths.  As we have explained at length, there can be many necessary causes of a result, and, if a Schedule II drug was a necessary cause of a victim's death, it would have been "beside the point" that a Schedule IV drug also happened to occupy the same status.  *Id.* at 211–12.

But the verdict rendered is likewise consistent with a finding that the Schedule II drugs were nonessential "contributing cause[s]," which did not make a difference to the ultimate outcome but merely "contribute[d] to an aggregate force

65

(such as mixed-drug intoxication) that is itself a but-for cause of death." *Id.* at 208, 214. The latter finding, of course, would be insufficient to support a 20-year mandatory minimum sentence under *Burrage*. *Id.* at 214–16. And because we cannot determine which of the two findings the special verdict reflects, the jury's verdict does not constitute the necessary finding that but for ingestion of a Schedule II substance, the victim would have lived.[16] That being so, the district court's application of § 841(b)(1)(C)'s sentencing enhancement cannot stand.[17]

Accordingly, we reverse the district court's application of § 841(b)(1)(C)'s 20-year mandatory minimum sentence on Counts 2–4 and remand the case for the district court to resentence Dr. Feldman "to a term of imprisonment of not more than 20 years" as to each of these counts. 21 U.S.C. § 841(b)(1)(C) (stating that "such person shall be sentenced to a term of imprisonment of not more than 20 years and if death or serious bodily injury results from the use of such substance shall be sentenced to a term of imprisonment of not less than twenty years or more than life").

---

[16] We emphasize that we are not saying that the jury acquitted Dr. Feldman of the charge that his dispensing of a Schedule II drug resulted in death. Rather, the outcome of our ruling is the same as it would have been had the Government never sought a specific finding from the jury on this issue.

[17] We are aware that an *Alleyne* error can be subject to harmless error review. *United States v. King*, 751 F.3d 1268, 1279 (11th Cir. 2014). The Government, however, has not argued that any *Alleyne* error here would be harmless beyond a reasonable doubt.

## CONCLUSION

For the above reasons, we **AFFIRM** the Feldmans' convictions, **REVERSE** Dr. Feldman's sentences on Counts 2–4, and **REMAND** for the district court to conduct a new sentencing hearing for Dr. Feldman.